Filed 4/15/16  P. v. Diaz CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DONIVAN DIAZ et al.,<br><br>        Defendants and Appellants. | B258629<br><br>(Los Angeles County<br>Super. Ct. No. BA387967) |

APPEAL from judgments of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Reversed in part, and affirmed with modifications in part.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant Donivan Diaz.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant Octavian Moore.

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant Michael Onley.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

After a jury trial, defendants Donivan Diaz, Octivan Moore,[1] and Michael Onley were convicted of the murder of Andrew Todd Cherry. The jury found true the allegations that they committed the murder while engaged in the crimes of robbery and burglary, and a principal discharged a firearm during the murder. Defendants were sentenced to life in state prison without the possibility of parole.

On appeal, defendants raise numerous claims of error. All three defendants contend the following: the trial court violated their federal and state speedy trial rights; the court violated defendants' right to be present at trial by conducting numerous hearings outside of their presence; the court erred in admitting portions of a police interview with one of the prosecution's key witnesses; the court erred by excluding third-party culpability evidence; the court violated defendants' due process rights by failing to exclude cell-phone evidence that defendants contend the prosecution did not produce until the middle of trial; the court violated defendants' due process rights when it failed to strike the testimony of the prosecution's rebuttal witness; insufficient evidence supports the jury's finding that Cherry died as a result of defendants' robbery and burglary; the prosecutor committed misconduct during closing argument by appealing to the sympathy and emotions of the jury; the court erred in instructing prospective jurors that defendants' trial did not involve the death penalty; the court failed adequately to investigate potential juror misconduct; and the court erred in imposing parole revocation restitution fines.

Moore and Onley contend the court violated their right of confrontation by admitting out-of-court statements Diaz made to his girlfriend that incriminated Moore and Onley; the court erred in admitting those statements as declarations against penal interest; and the felony-murder special circumstance enhancements are unconstitutionally vague. Finally, Onley contends the court erred in denying as

---

[1]    Although Moore's notice of appeal and appellate briefs indicate his first name is "Octavian," his first name appears consistently as "Octivan" throughout the record.

untimely his motion to represent himself so that he could bring his own motion for new trial at the sentencing hearing.

We conclude the court erred in denying Onley's motion for self-representation. We also conclude the court erred in imposing parole revocation restitution fines. We affirm in all other respects.

## PROCEDURAL BACKGROUND

In a second amended information, defendants were charged with murder (Pen. Code, § 187, subd. (a)).[2] As to each defendant, the information alleged he committed the murder while engaged in the crimes of robbery and burglary (§ 190.2, subd. (a)(17)(A)&(G)) (special circumstance allegation). The information further alleged each defendant committed the murder for the benefit of, at the direction of, and in association with, a criminal street gang (§ 1192.7, subdivision (c)(28)) (gang allegation). Finally, the information alleged that a principal personally and intentionally discharged a firearm in the commission of the murder (§ 12022.53, subdivisions (d) & (e)(1)) (firearm use allegation).

Defendants were tried by the same jury. The jury found each defendant guilty of murder, and found true as to each defendant the special circumstance allegation and the firearm use allegation. The jury found not true the gang allegation as to each defendant.

The court sentenced each defendant to a term of life in state prison without the possibility of parole. The court then vacated the firearm use allegation and ordered each defendant to pay a $300 parole revocation restitution fine under section 1202.45. As to each defendant, the court stayed its restitution order.

Defendants timely appealed.

---

[2]    All undesignated statutory references are to the Penal Code.

FACTUAL BACKGROUND

**The Prosecution's Case-in-Chief**

**1.     The burglary, robbery, and shooting**

In January 2011, Diaz and Onley were living together, and Diaz was dating Porscha Chambers. On January 22, 2011, Chambers went to Diaz and Onley's apartment.[3] Ryan Whitmore, whom Diaz had met earlier that day, was also at the apartment. Diaz, Chambers, and Whitmore decided to go to a party. Diaz drove them to a gas station, where they met Andrew Todd Cherry. While Diaz and Cherry talked, Chambers went to a store across the street to buy a bottle of alcohol. Diaz, Chambers, and Whitmore then went to Cherry's house to hang out before the party.

Cherry lived by himself, but he owned a parrot that talked. He sold clothes, electronics, and marijuana out of his house. When they arrived at Cherry's house, Chambers, Diaz, and Whitmore drank alcohol and smoked marijuana, and Whitmore also smoked Phencyclidine (PCP).

While at Cherry's house, Chambers allowed Diaz to use her phone to make several calls. Diaz became fidgety after using Chambers' phone. Diaz then asked Chambers to go to the store to buy some blunts so that they could smoke marijuana. When Chambers returned about five minutes later, Diaz asked to her to go back outside to grab something from his car, which was parked near Cherry's house. When she went outside, Chambers saw Onley and Moore standing under a tree.

Chambers then received a call from Onley, who asked for Diaz. Chambers replied that Diaz was inside Cherry's house. Onley and Moore then pulled hoods over their heads and walked toward the house. As Onley and Moore approached the house, Whitmore was trying to leave through the front door.[4] Onley and Moore tried to pull

---

[3]     Chambers also knew Onley and Moore. She testified that she knew Diaz by the name "Dorian," Onley by the name "Scrilla," and Moore by the name "No Good."

[4]     During her cross-examination, Whitmore testified that the men she struggled with were bald.

her inside the house with them, but she broke free. Onley and Moore then entered the house and closed the front door.

While Whitmore was outside, she heard what sounded like popping balloons, firecrackers, or gunshots. She then ran away from Cherry's house, and Chambers tried to follow her. Chambers eventually stopped following Whitmore and returned to Diaz's car. She then saw Diaz, Onley, and Moore leave the house carrying white bags or pillowcases that appeared to be stuffed with items. Diaz returned to his car, and Onley and Moore got into a different car. Diaz and Chambers then went looking for Whitmore. They found her outside of a nearby church, and Diaz told her to get into his car.

Diaz then drove Chambers and Whitmore to a party. Chambers and Whitmore stayed in the car while Diaz went inside for about 15 minutes. After leaving the party, Diaz dropped Whitmore off at a house and drove Chambers and himself to a motel room, where they met Moore who was with an unknown woman. After about 45 minutes, Moore and the woman left the motel room, and Diaz and Chambers stayed in the room until the next morning.

After leaving the motel, Chambers told Diaz that she was worried that her fingerprints would be found inside Cherry's house. Diaz told her not to worry because he had "got it already." During another conversation after they left the motel, Diaz told Chambers that he had returned to Cherry's house on January 23, 2011 and found Cherry lying face-down on the ground. He also told her that "they" had robbed Cherry, that he had Cherry's computer, and that "they" had killed Cherry's bird because it talked too much.

### 2. The discovery of Cherry's body

Before January 22, 2011, Cherry spoke to his family on a daily basis. However, between the evening of January 22 and the afternoon of January 24, 2011, Cherry did not speak to or contact any of his family members.

Cherry spoke to his mother every day; he took her to and from work and called her at night to check on her. Cherry last spoke to his mother around 8:30 p.m. on

5

January 22, 2011.  He also regularly spoke to his sister, brother-in-law, and brother, and he would often take his daughter to school in the morning.

Cherry and his family had planned to throw Cherry's son a birthday party on Sunday, January 23, 2011.  Cherry, however, never showed up to the party or told anyone that he was not coming.  During the morning of January 23, 2011, Cherry's mother tried calling him several times, but he never answered his phone.  Cherry's sister also tried calling him, but he did not answer her calls either.  Cherry's brother went to Cherry's house twice that day, but Cherry never answered the door.

On Monday, January 24, 2011, Cherry was supposed to drive his mother to work and his daughter to school, but he never contacted either of them.  His sister tried calling him that morning, but he did not answer his phone.  His sister, brother-in-law, and brother then went to his house around noon.

All doors to Cherry's house were locked, so Cherry's brother and brother-in-law forced open the front door.  They found Cherry, non-responsive, lying face down in a puddle of blood, with his hands tied behind his back and his feet bound by a jump rope.  Cherry had suffered seven gunshot wounds: four to the back of his head, one to his neck, and two to his legs.  Nine expended .22-caliber bullet cartridges were found near Cherry's body and throughout his living room.  Blood had pooled around Cherry's body, and there was blood on the ground in the living room, the kitchen, the hallway to a bedroom, and near the front door.

Law enforcement officers found no signs of forced entry at Cherry's house, aside from the front door that Cherry's brother and brother-in-law had forced open.  The inside of the house, however, looked like it had been ransacked.  Some of the furniture in the living room was overturned.  A computer cable in the living room had been cut and the corresponding computer was missing.  A dead bird with a broken neck was found in the kitchen, and some of the bird's feathers were found in the living room.  The officers also found a large amount of cocaine base, a white powder, a green leafy substance, and a digital scale in the living room.

6

Several fingerprints were found throughout the house. A fingerprint that matched Diaz was found on the frame to the front door, and two prints that matched Whitmore were found on a mug inside the house. Onley's and Moore's fingerprints were not found at Cherry's house.

### 3.     The investigation

#### a.     The time of Cherry's death

A coroner began examining the crime scene and Cherry's body around 6:15 p.m. on January 24, 2011. Cherry weighed approximately 320 pounds at the time of the examination. The coroner observed that by the time he started his examination, the blood that had pooled around Cherry's body had started to dry and Cherry's body had begun to decompose, indicating that Cherry had died between 24 and 48 hours earlier.

The coroner also compared the ambient temperature of the inside of Cherry's house with the temperature of Cherry's liver. As of 6:45 p.m., the ambient temperature in Cherry's house was 69 degrees, and the temperature of Cherry's liver was 75 degrees at 6:55 p.m. According to the coroner, the temperature of the human body typically starts to decrease from 98.6 degrees at a rate of 1.5 degrees per hour after death. However, environmental factors, such as the temperature of the area in which the body is located and the weight of the body, can affect the rate at which the body's temperature decreases. For example, a large, heavy body will cool down at a much slower rate than a small, thin body. Although a body's temperature could decrease more than 24 degrees over a 24 to 48 hour period, Cherry's weight and the fact that his body was lying on carpet could have slowed the rate at which his body's temperature decreased.

The coroner also observed that Cherry's body was not in rigor mortis at the time of the examination. According to the coroner, rigor mortis typically sets in about 12 hours after death and completely dissipates about 24 hours after death. When he conducted his examination, the coroner needed to use very little pressure to break the stiffness of Cherry's body, further indicating that Cherry had died at least 24 hours

earlier.  Based on his observations of the crime scene and Cherry's body, the coroner concluded that Cherry died between 24 to 48 hours before his body was examined.

On January 27, 2011, a medical examiner conducted an autopsy of Cherry's body.  He concluded that Cherry was killed by the four gunshots to his head.  The medical examiner could not, however, determine an exact time of death.  He testified that it is very difficult to pinpoint a time of death based on a post-mortem examination of a body.  According to the medical examiner, many factors affect the time-of-death determination, including the condition of the body, the environmental conditions in which the body was found, and evidence of the last time the victim was seen alive.  Based on his own observations and those made in the coroner's report, the medical examiner concluded that Cherry had died between 10 and 48 hours before the time his body was first examined on January 24, 2011.

### b.  Whitmore's statements to the police

On July 19, 2011, Los Angeles Police Detective Young Mun[5] detained Whitmore for questioning about Cherry's murder.  Whitmore's interview was recorded and played to the jury.

Whitmore initially denied knowing who Cherry was or having gone to his house.  However, she eventually told the police that a man and a woman, whom she had met on January 22, 2011, but whose names she did not know, took her to Cherry's house to hang out, drink, smoke, and watch a movie.  The man who drove her to Cherry's house was driving a gold sports utility vehicle.  At some point while she was at Cherry's house, she went outside to retrieve her purse.  The woman with whom she went to Cherry's house was already outside.  While they were outside, Whitmore saw two men walk toward the house.  The men tried to pull Whitmore back inside the house, but she pulled free and stayed outside.  She then heard what she thought were gunshots from inside the house.  She became scared and ran to a nearby church.  The man and woman who took Whitmore to Cherry's house later found her at the church and forced her into

---

[5]    Detective Mun was the prosecution's lead investigator at trial.

the man's gold sports utility vehicle. They then dropped her off at an unknown location.

At the end of her interview, the police showed Whitmore a group of photographs of different men. She identified Diaz as the man who drove her to Cherry's house and forced her into his car after she left the house. On August 15, 2011, Whitmore was shown another group of photographs and identified Chambers as the woman with whom she went to Cherry's house.

### c.      Chambers' statements to the police

On August 18, 2011, Chambers and Diaz were arrested together while Diaz was driving a gold sports utility vehicle. Detective Mun interviewed Chambers about Cherry's murder later that day.[6] Portions of Chambers' interview were played for the jury.

Most of Chambers' statements to the police were consistent with the testimony she later gave at trial. However, there were some differences between her statements to the police and her testimony. For example, during the beginning of her interview, she denied knowing what happened to Cherry on the night she went to his house, claiming that she left his house early because she felt sick and had started to vomit.

During the interview, Chambers recounted a conversation she had with Diaz the day after they went to Cherry's house, in which Diaz described what happened while he was inside the house with Onley and Moore. She said, "[Diaz] told me that they have robbed [Cherry] or whatever . . . . [¶] He was like, you don't know the dude. No-Good, he said that he think the dude No-Good, shot him or whatever. I'm like how you don't know if you shot him or not, he's like my head was down. I'm like how you don't know? It's a sound, there's no way that you cannot hear a gunshot, you know I'm saying, so how you don't know if he dead or not? He just talking about they hurried up and made me leave."

---

[6]      The police later helped Chambers move to a new home.

9

At the end of the interview, Chambers identified Onley from a photographic lineup. She told the police that Onley was Diaz's brother and that he was one of the two hooded men she saw enter Cherry's house on the night Cherry was killed. On September 27, 2011, Chambers identified Moore from a different photographic lineup. She identified Moore as the man called "No-Good," and she confirmed that he was the other man with Onley and Diaz on the night defendants robbed Cherry.

### d. Electronic evidence

### i. Onley's electronic monitoring device

In January 2011, Onley was wearing an ankle monitor containing a global positioning system tracking device that the California Department of Corrections and Rehabilitation used to track his movements. The monitor was tracking Onley's movements on January 22, 2011, the night defendants robbed Cherry, as well as on January 23, 2011.

Around 9:07 p.m. on January 22, 2011, Onley was near a tree in front of Cherry's house. Onley then moved inside Cherry's house, where he remained from 9:10 p.m. to 9:17 p.m. Data from Onley's monitor and two of Cherry's cell phones showed that after Onley left Cherry's house, Onley and Cherry's phones travelled together in the same direction for more than an hour, indicating that Onley had taken Cherry's phones from the house.

Data from Onley's monitor also showed that at around 8:18 p.m. on January 23, 2011, Onley went back to Cherry's house. Onley remained at Cherry's house until 8:30 p.m. Around 8:35 p.m., he returned to his own home a few blocks away from Cherry's house.

### ii. Cell-phone records

The prosecution also introduced records for the cell phones defendants used around the time of Cherry's murder. Although defendants did not use any cell phones registered in their names, statements from other witnesses established that defendants had used other people's phones to communicate with each other before and after they entered Cherry's house on January 22, 2011. Chambers testified that she had allowed

Diaz to use her cell phone several times on January 22, 2011. Deserie Sherlock, who was working as a prostitute around the time of Cherry's murder, testified that a Black male had stolen her phone sometime between August 2010 and June 2011.

On January 22, 2011, around the time Moore and Onley were seen at Cherry's house, Chambers' phone received several calls from a phone number registered in Sherlock's name. On January 28, 2011, Moore's roommate received several phone calls from the phone registered in Sherlock's name.

The prosecution's cell-phone expert testified about the locations of Chambers' and Sherlock's phones on the evening of January 22, 2011. At 8:12 p.m., Chambers' phone communicated with a cell tower located near Cherry's house, and Sherlock's phone communicated with a cell tower located near Moore's house. Between 8:27 p.m. and 9:09 p.m., Chambers' phone continued to communicate with the cell towers located near Cherry's house. At 8:29 p.m., Sherlock's phone began to communicate with cell towers located near Cherry's house, and it continued to do so until 9:44 p.m. Data from Onley's ankle monitor showed that Onley was moving along the same path as Sherlock's phone.[7]

**Defense Evidence**

### 1. Cherry's neighbors

Defendants introduced the testimony of several of Cherry's neighbors who either claimed to have seen Cherry alive, or heard sounds like fireworks or gunshots in the neighborhood, on January 23, 2011, the day after defendants robbed Cherry. Linda Page, who lived on Cherry's street, had grown up with Cherry, his brother, and defendants. Although Cherry and his brother were twins, she could tell them apart. She saw Cherry and another woman at a liquor store near Cherry's house around 11:00 p.m. on January 23, 2011. Cherry bought her a beer.

---

[7] The prosecution also introduced the testimony of a gang expert to support the gang allegations. We do not summarize that evidence because the jury did not reach a true finding as to the gang allegations, and defendants do not raise any issues for which that evidence is relevant.

11

Lucy Gardner was also one of Cherry's neighbors. She had known Cherry since he was a teenager. She thought of him like her "son," and Cherry would often refer to her as "Momma Lucy." She also could tell Cherry and his brother apart. She saw Cherry and another man at a liquor store around 1:00 p.m. or 2:00 p.m. on January 23, 2011. Cherry greeted her and told her that he would see her later. When Gardner returned home from the liquor store, Cherry pulled up in front of her house and said, " 'Momma, I see you later on. Do you want anything?' " She replied no, and Cherry left. Cherry returned to her house around 8:00 p.m. that night to ask her if she wanted him to buy her any food.

Melba Thompson, who lived a few houses away from Cherry, heard fireworks around 9:30 p.m. or 10:00 p.m. the night before Cherry's body was found. She did not hear any firecrackers or gunshots on January 22, 2011. Thompson did not know Cherry or Chambers, but she did recognize Chambers from the neighborhood. Thompson had seen Chambers come and go from Cherry's house on several occasions. She also saw Chambers ride by Cherry's house in a car with hydraulics on the morning of January 23, 2011.

Freddie Williams, another one of Cherry's neighbors, told the police that he had seen Cherry in front of Cherry's house between 10:00 a.m. and 11:00 a.m. on January 23, 2011.[8] Cherry, who was with another man at the time, invited Williams to his house for a beer.

### 2.     Expert testimony

Diaz called Ronald Markman, a psychiatrist, who testified about the potential effects of PCP, marijuana, and alcohol on a person's memory and mental acuity. Dr. Markman testified that PCP can distort a person's emotions and ability to think, perceive, and act. Specifically, PCP can cause a person to suffer hallucinations and

---

[8]     Freddie Williams was unable to testify because he died before trial. His statements were introduced through Detective Mun's testimony. Detective Mun testified that at the time he interviewed Williams shortly after Cherry's body was discovered, Williams' speech was slightly slurred and there were several prescription medication bottles in Williams' home.

delusional thoughts. PCP can also produce conditions that "mimic" schizophrenia. Depending on a person's history of using PCP and the concentration of PCP used on a particular occasion, the drug can significantly affect that person's ability to accurately perceive what is going on around her. Dr. Markman also testified that using marijuana can negatively affect a person's short-term memory. Finally, Dr. Markman testified that drinking a pint of gin could affect a person's ability to perceive and remember events. However, he also testified that the extent to which a person's perception and memory would be impaired by consuming alcohol on a particular occasion depends on that person's history of consuming alcohol. If the person frequently drinks, she will develop a higher tolerance to alcohol, and the amount of alcohol needed to impair her perception and memory will increase.

## DISCUSSION

### I. Defendants Were Not Denied Their Right to a Speedy Trial

#### 1. Relevant proceedings

Diaz was arrested on August 18, 2011, Onley was arrested on August 19, 2011, and Moore was arrested on May 1, 2012. The preliminary hearing was conducted on December 14 and 17, 2012, and the prosecution filed the original information on December 31, 2012, charging each defendant with murder. At the time the original information was filed, the prosecution had yet to decide whether to pursue the death penalty against defendants. At the arraignment hearing held on December 31, 2012, Diaz refused to waive time for trial, and each defendant pled not guilty.

At a hearing on January 10, 2013, the prosecution informed the court that it had yet to decide whether to pursue the death penalty. Diaz again refused to waive time for trial. The court then advised Diaz that the prosecution was still deciding whether to pursue the death penalty, and that if it decided to do so, Diaz's attorney would need significant time to prepare for the penalty phase of trial. Diaz responded, "To be honest with you, your honor, I've been locked up 18 months. It's a very long time for me to be incarcerated. Everything should have been taken care of by now. It's been a year and a half and I'm still waiting."

13

The prosecutor then informed the court that the prosecution's death-penalty committee needed more time to consider the strength of the prosecution's case, as well as the strength of any mitigating evidence, before it could decide whether to pursue the death penalty. However, she stated that if the case were "rushed" to trial, the prosecution would pursue the death penalty. Diaz's counsel informed the court that if the prosecution did pursue the death penalty and his client did not waive time for trial, he would be unable to prepare an adequate defense for the penalty phase, and he was certain that he would render ineffective assistance if the case went to trial within 60 days. He requested that the court grant a continuance despite his client's refusal to waive time.

Moore and Onley then refused to waive time. Onley's counsel informed the court that he also would not be able to prepare for a death penalty trial within 60 days. Over defendants' objections, the court continued the case to January 29, 2013.

On January 29, 2013, the prosecution had yet to decide whether to pursue the death penalty. Moore's counsel informed the court that he would not be able to prepare for a death-penalty trial within 60 days and requested that the court continue the case for a reasonable time. Moore and Diaz waived statutory time, but Onley refused to do so. The court found good cause to grant a continuance over Onley's objection.

On February 28, 2013, the prosecutor stated that the death-penalty evaluation was almost complete. Moore agreed to waive time, but Diaz and Onley refused to do so. Onley stated, "Your honor, I'm ready to go forward, whatever they have. If she can prove it – if they can prove I had anything to do with this, then just prove it." Counsel for all three defendants informed the court that they were not ready to proceed to trial. The court found good cause to continue the case over Diaz's and Onley's objections.

On April 9, 2013, the prosecutor stated that the District Attorney's Office still had yet to decide whether to pursue the death penalty, but she believed a decision would be made soon. Diaz, Onley, and Moore refused to waive time, and Diaz addressed the court, stating, "I just feel like my rights [have] been violated because I've waived time since I been in superior court. . . .  [¶]  I'm requesting a federal speedy trial so I can get

14

this over with and get on with my life." Counsel for all three defendants stated that they were not prepared to go forward with trial. Moore's counsel stated that he would not be prepared for trial until after the prosecution reached a decision concerning the death penalty. Moore then addressed the court, stating: "When we came to court last time, she [the prosecutor] said it should be ready by this court date. . . . [¶] . . . It's, like, I'm being denied my due process. She told me on the last court date it would be ready — "

The court responded, "Yes, but the thing is, it isn't – if the People are ready, that's great . . . . [¶] . . . But it's whether the defense can prepare their case and represent their client in an appropriate way, without committing ineffective assistance of counsel, and almost every counsel here – I think all of them have expressed that if they were forced to go within the time period, they would be committing [ineffective assistance], is my understanding." After Diaz and Moore again expressed concern about the length of the delay in bringing the case to trial, the court found good cause to grant a continuance over defendants' objections.

On May 23, 2013, the prosecutor informed the court that the death-penalty committee was scheduled to meet on June 12, 2013, and that a decision should be made shortly thereafter. The court informed defendants that once the prosecution reached a decision concerning the death penalty, their attorneys would need additional time to prepare for trial, even if the prosecution did not pursue the death penalty. Defendants continued to refuse to waive time. After refusing to waive time, Moore asked the court, "What is 'being prepared?' No motion [has] been prepared. Nothing. For the past four months, we keep coming back, to no avail." The court replied that once the prosecution made its death-penalty determination, defendants' attorneys would likely begin filing any necessary motions. The court then found good cause to grant a continuance over defendants' objections.

On June 26, 2013, the prosecution filed an amended information alleging a gang allegation against each defendant. On June 27, 2013, the prosecution announced that it would be pursuing sentences of life without the possibility of parole, and not the death penalty, against defendants. Counsel for Diaz informed the court that he and the rest of

15

defense counsel needed additional time to prepare for trial because, until the prosecution decided not to pursue the death penalty, they had focused most of their efforts on persuading the prosecution not to pursue the death penalty and preparing for a possible penalty phase of trial. The court explained to defendants that their attorneys had spent a significant amount of time preparing for a possible death-penalty trial, especially the penalty phase, and, as a result, would need additional time to focus their efforts on the issue of guilt in a trial that would not involve the death penalty. Defendants pled not guilty to the gang allegations alleged in the amended complaint, and they continued to refuse to waive time. Based on defense counsel's representations that they needed additional time to prepare for trial, the court found good cause to grant a continuance over defendants' objections.

On August 14, 2013, defendants continued to refuse to waive time. However, counsel for each defendant informed that court he needed additional time to prepare for trial. Counsel for Diaz explained that all three attorneys needed more time to "catch up" on the issue of guilt because they had focused their efforts on a possible penalty phase, looking for mitigating evidence to present to the prosecution. He stated that the attorneys also needed additional time to prepare various motions, including severance and dismissal motions.

The court indicated that it would continue the case over defendants' objections and set a hearing in November 2013, by which time defendants' attorneys planned to file any necessary motions. The prosecutor informed the court that she anticipated being in the middle of a death penalty trial on that date, but she agreed to have another attorney stand in for her if she was not available. She also informed the court that the prosecution had recently handed over to defense counsel a large amount of discovery, which she anticipated would take a significant amount of time to process. The court again found good cause to grant a continuance over defendants' objections.

As of November 4, 2013, defense counsel had yet to file any motions. However, counsel for Onley told the court that all three attorneys were in the process of preparing motions to dismiss. Counsel for Onley also informed the court that he had experienced

16

medical issues and counsel for Diaz had lost some members of his family since the last hearing date. Counsel for Onley assured the court that he would file a motion to dismiss and any necessary discovery requests in advance of the next hearing. All three defendants continued to refuse to waive time, and Moore complained that his counsel's failure to file any motions or be prepared for trial violated his due process and speedy trial rights. The court acknowledged Moore's objection and noted that his attorney had experienced health issues since the last court date. The court again found good cause to grant a continuance over defendants' objections.

On January 22, 2014, counsel for Onley filed a motion for a continuance. The court conducted a hearing on January 24, 2014. Counsel for all three defendants explained that they needed more time to prepare for trial and to draft motions. Defendants again refused to waive time, and the court found good cause to grant a continuance over their objections. The court set a trial date for April 28, 2014.

On March 21, 2014, counsel for Diaz filed a motion to dismiss under section 995. Counsel for Onley and counsel for Moore did not file their own motions, but joined in Diaz's motion. In a hearing held outside defendants' presence, the court stated that it had expected defense counsel to file their motions before March 21, 2014. The court set a hearing on defendants' motion to dismiss for April 28, 2014, the first day of trial.

On April 28, 2014, the prosecution filed a second amended information. That same day, the court heard and denied Diaz's motion to dismiss, ruled on other oral motions raised by defendants, and began jury selection. A jury was sworn on May 1, 2014.

### 2. Defendants' federal speedy trial rights were not violated

"The state and federal Constitutions guarantee a defendant facing criminal charges the right to a speedy trial. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) This right protects an accused from facing an unduly lengthy period in which criminal charges are pending." (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1193 (*Hajjaj*).)

A defendant's federal right to a speedy trial is triggered by arrest or the filing of an official accusation. (*People v. Martinez* (2000) 22 Cal.4th 750, 755.)

In determining whether a defendant's federal speedy trial right was violated, courts weigh four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. (*Barker v. Wingo* (1972) 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (*Barker*); see also *People v. Lomax* (2010) 49 Cal.4th 530, 558 (*Lomax*).) "None of these four factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.' [Citation]. The burden of demonstrating a speedy trial violation under *Barker*'s multifactor test lies with the defendant." (*People v. Williams* (2013) 58 Cal.4th 197, 233 (*Williams*).) We address the four *Barker* factors in turn.

### a. Length of the delay

An analysis of the length of the delay involves a two-part inquiry. (*Williams*, *supra*, 58 Cal.4th at p. 234.) To trigger a speedy trial analysis, the defendant must demonstrate that the delay was "presumptively prejudicial." (*Ibid.*) Typically, a pretrial delay is presumptively prejudicial if it approaches, or exceeds, one year. (See *ibid.*) If the defendant makes a showing that the delay was presumptively prejudicial, we then look at the actual length of the delay. (*Ibid.*) The longer the delay stretches beyond the "bare minimum" needed to trigger judicial review of the claim, the more likely it is that the delay actually prejudiced the defendant. (*Ibid.*) In other words, " 'the presumption that pretrial delay has prejudiced the accused intensifies over time.' [Citation.]" (*Ibid.*) However, "[i]n a complex case, delay will weigh less heavily against the state because the significance of the delay 'is necessarily dependent upon the peculiar circumstances of the case' and because 'the delay that can be tolerated for an ordinary street crime is considerably less than for a serious . . . charge.' [Citation.]" (*Ibid.*)

18

The parties do not dispute that the delays of nearly three years between the time Diaz and Onley were arrested and trial began, and nearly two years between the time Moore was arrested and trial began, were presumptively prejudicial. However, that does not mean that defendants were actually prejudiced by the delay. As noted, longer delays generally are tolerated in complex cases. (See *Williams*, *supra*, 58 Cal.4th at p. 234.) Certainly, defendants' case was complex. It involved three defendants charged with murder, where the prosecution seriously weighed the possibility of pursuing the death penalty against each defendant. In addition, the investigation of the crime was complicated, as there were no eyewitnesses to Cherry's murder, but there was a substantial amount of electronic evidence that the prosecution relied on to connect defendants to the crime, most of which was contained in voluminous cell-phone records that were difficult to interpret.

### b. Reason for the delay

Next, we look to the reason for the delay and who was responsible for causing it. (See *Williams*, *supra*, 58 Cal.4th at p. 233.) " 'A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.' [Citation.]" (*Id*. at p. 239.) As a general rule, delays sought by defense counsel are attributable to their clients. (*Id*. at p. 245.) Thus, delays requested by defense counsel, even if made over the defendant's objection, are ordinarily attributable to the defendant. (*Id*. at p. 246.) However, this rule is not absolute. (*Id*. at p. 247.) Delay resulting from a systemic " ' "breakdown in the public defender system," [citation], could be charged to the State.' [Citation.]" (*Ibid*.)

Here, the cause of the delay is attributable to both the prosecution and the defense. Throughout the six months after the first information was filed, the prosecution was deliberating about whether to pursue the death penalty. This portion of

19

the delay is attributable to the prosecution.  However, the six-month delay ultimately worked in defendants' favor because it allowed defense counsel the opportunity to present mitigating evidence to the prosecution, after which the prosecution ultimately decided against pursuing the death penalty.  (See *Lomax*, *supra*, 49 Cal.4th at p. 554 [some of the delay caused by the prosecution deliberating about whether to pursue the death penalty "was for defendant's benefit, because the committee gave defendant an opportunity to submit mitigating evidence and seek a lesser penalty"].)

Defendants also complain that the prosecution was responsible for a one-month delay between October and November 2013, because the prosecutor was in trial on a different case.  However, during that one-month period, none of defendants' attorneys indicated that they were ready to proceed to trial, and the prosecutor's absence did not delay the filing or disposition of any motions.  In fact, during that period, defendants' attorneys continued to represent to the court that they needed additional time to prepare for trial.

The ten-month delay after the prosecution decided against pursuing the death penalty is attributable to defense counsel.  After the prosecution announced its decision, all three defense attorneys informed the court that they were not prepared to go to trial because they had devoted nearly all of their time up to that point looking for evidence that would mitigate against pursuing the death penalty and preparing for a possible penalty phase of trial.  Although defendants' attorneys continued to regularly request continuances over their clients' refusals to waive time after the prosecution made its decision, they did so because they had been unable to devote meaningful time to prepare for the issues concerning guilt while the prosecution was deliberating about the death penalty.

Defendants acknowledge the general rule that defense counsel's delay is attributable to the defendant.  (See *Williams*, *supra*, 58 Cal.4th at p. 246.)  However, they argue that they should not be saddled with the delay caused by their attorneys, claiming their attorneys did not act diligently in preparing for trial.  They explain that the fact that their attorneys failed to file any pretrial motions until shortly before voir

dire demonstrates that their attorneys failed to prepare for trial in a timely manner. While defendants' attorneys were not expedient in preparing for trial, there is nothing in the record to show that their delay resulted from a systemic breakdown in the public defender system. (See *id.* at pp. 241, 248-249 [there must be evidence identifying systemic or institutional problems, and not just evidence of problems with an individual attorney, to shift the charge for the delay from the defendant to the state].) Without such a showing, defendants must be charged with the delay caused by their attorneys. (*Id.* at p. 249.)

### c. Assertion of the right to a speedy trial

" 'The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.' [Citation.]" (*Williams*, *supra*, 58 Cal.4th at pp. 237-238.) The focus for this factor " 'is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct . . . , and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial.' [Citation.]" (*Id*. at p. 238.) " 'Although a criminal defendant may not be deprived of a speedy trial because the prosecution—or the defense—is lazy or indifferent, or because the prosecution seeks to harass the defendant rather than bring him fairly to justice, a criminal defendant may not juggle his constitutional rights in an attempt to evade prosecution. He may not demand a speedy trial and demand adequate representation, and, by the simple expedient of refusing to cooperate with his attorney, force a trial court to choose between the two demands, in the hope that a reviewing court will find that the trial court has made the wrong choice.' [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 556.)

The People do not contest that defendants repeatedly, consistently, and sincerely asserted their right to a speedy trial throughout most of the pretrial proceedings. From April 9, 2013, until trial began in April 2014, defendants refused to waive time at every pretrial proceeding. In addition, defendants were very vocal about their desire to

proceed to trial, regularly informing the court that they were willing to proceed to trial without their attorneys' assistance because they were tired of waiting in custody. However, as we discuss below, when considered with all of the other factors, this factor does not establish a speedy trial violation.

### d.    Prejudice

Whether a defendant suffered prejudice as a result of the delay must be assessed in light of the following interests:  " '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' [Citation.]" (*Williams*, *supra*, 58 Cal.4th at p. 235.)  Of these interests, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.  If witnesses die or disappear during a delay, the prejudice is obvious.  There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.  Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." (*Barker*, *supra,* 407 U.S. at p. 514.)

Defendants argue that they were prejudiced by the delay in bringing their case to trial because they were subject to anxiety as a result of prolonged incarceration, and because they lost exculpatory evidence while their case was pending trial.  While we do not disagree that periods of pretrial incarceration of nearly two and three years would cause serious stress and anxiety for a defendant, the degree to which a specific period of delay prejudices the defendant is dependent on the reason for the delay.  (See *Williams*, *supra*, 58 Cal.4th at pp. 237-238.)  As we already discussed, defendants' case was complex, and for nearly two years after Diaz and Onley were arrested, or six months after the first information was filed, the prosecution was considering pursuing the death penalty.  Assigned to a potential death penalty case, defense counsel needed to devote substantial time and resources to the penalty issue, which necessarily detracted from their ability to prepare for the issues of guilt.  Accordingly, once the prosecution decided not to pursue the death penalty, a decision that heavily benefitted defendants,

defendants' attorneys essentially needed to start anew in their preparation for trial, since they had, to that point, been unable to focus on the issues concerning guilt.

As for the loss of exculpatory evidence, defendants contend that the pretrial death of Freddie Williams, who told the police that he had seen Cherry alive on the day after defendants robbed him, precluded them from calling a witness who could help establish a crucial element of their defense--i.e., that someone other than defendants killed Cherry. The record is unclear, however, when Williams died. During the prosecution's case in chief, the prosecution's lead investigator, Detective Mun, testified that Williams had passed away before trial. Defendants point to no portion of the record, however, that shows when Williams passed away. Accordingly, they have not demonstrated that had their case been brought to trial earlier, Williams would have been able to testify. (See *Williams*, *supra*, 58 Cal.4th at p. 236 [a defendant must show that the delay caused the prejudice].)

In any event, defendants were not prejudiced by their inability to call Williams as a witness. The facts to which Williams would have testified were cumulative of the facts that Cherry's other neighbors--Gardner, Thompson, and Page--had testified to, namely that Cherry had been seen alive in his neighborhood the day after the prosecution claimed he had been killed. In addition, the jury heard Williams' statements to the police in which he described seeing Cherry alive on the day after defendants robbed him. Although the prosecution attacked Williams' credibility by highlighting his alleged use of alcohol and prescription drugs, Williams' statements were ultimately corroborated by the testimony of Gardner, Thompson, and Page.

Finally, defendants contend that they were prejudiced by the delay because the memories of several defense and prosecution witnesses appeared to have faded since the time Cherry was murdered. They do not, however, explain what evidence was lost as a result of the witnesses' fading memories, aside from claiming that the testimony of some witnesses could have been called into question due to "occasional failures of recollection." Such a claim is not sufficient to establish prejudice. (See *Williams*, *supra*, 58 Cal.4th at p. 236 [vague and unspecific claims of prejudice are insufficient to

23

establish a speedy trial violation; the defendant must specifically identify "what testimony might have been lost or distorted as a result of the delay in this case"].)

### e. Balance of the factors

On balance, we conclude defendants' federal speedy trial rights were not violated by the delay between when they were arrested and the time trial began. Although defendants regularly and consistently invoked their speedy trial rights by refusing to waive time throughout pretrial proceedings, there was good cause for the court to grant their attorneys' requests for continuances. Defendants' case was complex, and for about six months, the prosecution deliberated over whether to pursue the death penalty. In addition, most of the delay is attributable to defendants' attorneys. Before the prosecution reached its decision to not pursue the death penalty, defendants' attorneys were understandably focusing most of their attention and efforts on producing mitigating evidence and preparing for a possible penalty phase of trial. After the prosecution announced that it would not pursue the death penalty, defendants' attorneys needed a substantial amount of time to catch up on the issues relating to guilt, which they were unable to devote meaningful time to until the prosecution reached its penalty decision. The need for defendants' attorneys to prepare defenses concerning the issue of guilt outweighed any prejudice defendants may have suffered by the delay.

### 3. Defendants' state speedy trial rights were not violated

Article I, section 15, of the California Constitution also guarantees a criminal defendant the right to a speedy trial. (*Hajjaj*, *supra*, 50 Cal.4th at p. 1193.) Section 1382 implements that right. (*Ibid.*) Under section 1382, a defendant must be brought to trial within 60 days of his arraignment on an information, unless he waives the 60-day period or the court finds good cause to continue the trial beyond that period. (*Id.* at p. 1194.) If the defendant is not brought to trial within the 60-day period and he either does not waive time or good cause for a continuance is not shown, the court must dismiss the action. (§ 1382, subd. (a); *Hajjaj*, *supra*, 50 Cal.4th at p. 1193.)

The court has broad discretion to determine whether good cause exists to continue the trial, and we will not disturb the court's finding of good cause unless there

24

has been an abuse of discretion. (*Hajjaj*, *supra*, 50 Cal.4th at pp. 1197-1198.) " '[A] number of factors are relevant to a determination of good cause: (1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay. [Citations.]' " (*Id*. at p. 1197.) Good cause exists when the delay is caused by the defendant or occurs for the defendant's benefit. (*Id*. at p. 1198.) It also exists when there has been an unexpected illness or unanticipated unavailability of counsel. (*Ibid*.)

A defendant seeking post-conviction relief for a violation of his speedy trial right must demonstrate that he was prejudiced by the delay. (*Lomax*, *supra*, 49 Cal.4th at pp. 556-557.) In evaluating prejudice, we " ' "weigh the effect of the delay in bringing the defendant to trial or the fairness of the subsequent trial itself." '- [Citation.]" (*Id*. at p. 557.)

For similar reasons to those discussed above, we conclude the trial court acted within its discretion under section 1382 in finding good cause existed to continue defendants' case over their objections. Again, the delay in bringing defendants to trial worked largely to their benefit. The period of delay before the prosecution announced that it would not pursue the death penalty provided defendants' attorneys the opportunity to present mitigating evidence to the prosecution. This delay worked to defendants' benefit because the prosecution decided to seek a lesser penalty. The delay after the prosecution announced its penalty decision also worked in defendants' favor, since that period allowed defendants' attorneys to prepare defenses to the prosecution's theories of guilt.

Defendants also have failed to demonstrate they were prejudiced by the delay. Although Williams died before trial, it is unclear when he died. Accordingly, defendants cannot show that if not for the delay, Williams would have been able to testify. In any event, defendants were not prejudiced by Williams' unavailability, because his statements to the police were heard by the jury, and those statements were cumulative of the testimony of Gardner, Thompson, and Page.

25

## II.     Defendants' Right to be Present Was Not Violated[9]

Defendants next contend the trial court violated their constitutional and statutory right to be present at all critical stages of a criminal trial when it conducted 17 proceedings outside their presence.  " 'Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." ' [Citations.] " (*People v. Blacksher* (2011) 52 Cal.4th 769, 799 (*Blacksher*).)  Due process guarantees a defendant's presence at any stage that is critical to the outcome of trial and where the defendant's presence would contribute to the fairness of the procedure.  (*Ibid.*)  The right to be present guaranteed by the California Constitution is coextensive with the federal due process right.  (*Ibid.*; see also Cal. Const., art. I, § 15)  Neither the federal Constitution, nor state law, requires the defendant's " 'personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him. [Citations.]' [Citations.]" (*Blacksher*, *supra*, 52 Cal.4th at p. 799.)  A defendant bears the burden of demonstrating that his absence prejudiced him or deprived him of a fair trial.  (*Ibid.*)

Two of the 17 proceedings conducted outside defendants' presence took place before trial.  On March 21, 2014, Diaz's counsel filed a motion to dismiss the information under section 995.  The court held a hearing that same day.  The court acknowledged that counsel for Diaz had filed the motion to dismiss, and it set a hearing on the motion for April 28, 2014, the same day voir dire was scheduled to begin. Onley's counsel advised the court that he was scheduled to be in trial on April 17, 2014, but that he would likely be finished with that trial by April 28, 2014.  The prosecutor advised the court that she would be out of the office on vacation from March 22, 2014 until April 14, 2014.  The court made no rulings at the March 21, 2014 hearing, and the

---

[9]     Onley raised the issue in his opening brief.  Moore joined in Onley's argument through his supplemental brief, and Diaz joined in Onley's argument through his opening brief.

26

court and counsel discussed no issues besides the scheduling of the hearing on Diaz's motion to dismiss.

On April 28, 2014, before starting voir dire and outside defendants' presence, the court discussed discovery issues with counsel for Diaz and counsel for Onley. Onley's and Diaz's attorneys complained that they had received untimely discovery of certain cell-phone records, and they opposed the prosecution's plan to call a witness whose testimony would help establish that one of the defendants had used the witness's cell phone in connection with Cherry's murder. However, the court did not make any rulings concerning these issues. Rather, the court stated that it would allow time for the court and the parties to consider the issues further. After a short recess, defendants were brought into the courtroom and the court ruled on a number of motions filed by defendants, including Diaz's motion to dismiss filed on March 21, 2014. After another short recess, the court began voir dire with defendants present.

Defendants contend their presence was required at the March 21 and April 28, 2014 proceedings because they would have learned "significant information which [they] could have used to convince the court of the validity of [their] speedy trial claim[s]." Specifically, they argue they would have learned about their attorneys' lack of preparation for trial and commitments to other cases, which they could have cited in support of their speedy trial claims. Defendants cannot demonstrate they were prejudiced by their absence from these proceedings because, as we have already discussed, their speedy trial rights were not violated by the court's granting of continuances to allow their attorney's more time to prepare for trial. Defendants do not claim that their absence from these two proceedings affected the outcome of trial or deprived them of a fair trial in any other way.

The other 15 proceedings conducted outside defendants' presence were held during trial. These proceedings involved the admissibility of certain evidence, including which portions of the recording of Chambers' interview with the police could be admitted; discovery issues; the scheduling of witness testimony; the allowable scope of certain witnesses' testimony; the allowable scope of the attorneys' examination of

27

certain witnesses; the dismissal of a juror due to a death in the juror's family; the applicability of certain jury instructions; and an inappropriate comment included in an email Diaz's attorney sent to the prosecutor. All of these proceedings concerned "procedural, evidentiary, and housekeeping matters" for which defendants were not required to be present. (See *People v. Carrasco* (2014) 59 Cal.4th 924, 959; *People v. Lynch* (2010) 50 Cal.4th 693, 745-746 (*Lynch*) [defendant's presence not required at discussion of jury selection procedures], abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610; *People v. Kelly* (2007) 42 Cal.4th 763, 781-782 [defendant's presence not required when a prospective juror was questioned and ultimately excused for cause]; *People v. Box* (2000) 23 Cal.4th 1153, 1191-1192 [defendant's presence not required during discussion of whether defense counsel's questioning of a certain witness rendered other evidence admissible], disapproved of on other grounds in *People v. Martinez* (2010) 47 Cal.4th 911; *People v. Waidla* (2000) 22 Cal.4th 690, 741-743 (*Waidla*) [defendant's presence not required during discussion of jury instructions].) In any event, defendants make no attempt to explain how their presence at these 15 proceedings would have affected the result of their trial. Indeed, in his opening brief, Onley admits that it is uncertain what impact, if any, his appearance at these hearings would have had on the outcome of the trial. Moore and Diaz also make no attempt to explain what impact their appearances at these hearings would have had on the outcome of their trial. We conclude defendants have not met their burden of demonstrating they were prejudiced by not appearing at any of the proceedings from which they were absent. (See *Blacksher*, *supra*, 52 Cal.4th at p. 799.)

### III. The Trial Court Properly Admitted Diaz's Out-of-Court Statements

Moore and Onley contend several of Diaz's out-of-court statements introduced through Chambers' testimony violated their Sixth Amendment right of confrontation because those statements implicated them in Cherry's murder. Moore and Onley also contend the court erred in admitting Diaz's statements implicating them in Cherry's murder because those statements were inadmissible hearsay. Specifically, they argue

28

the statements were not sufficiently reliable or specifically disserving of Diaz's penal interest to be admissible under Evidence Code section 1230.

### 1. Relevant proceedings

While Chambers was testifying about a conversation she had with Diaz after they left Cherry's house, the prosecutor asked her whether Diaz said anything about a bird. Moore's counsel objected on hearsay and Sixth Amendment grounds. He argued that Chambers' response would constitute inadmissible hearsay and improperly implicate Moore as a participant in the crime. He asserted that the jury would know that any plural pronoun used by Chambers would refer to Moore and Onley, since they were the only other people inside Cherry's house with Diaz. The court overruled the objection, stating: "It doesn't matter. It's still being offered. This isn't an *Aranda/Bruton* issue because he's speaking not to the police or an agent of the police[;] he's speaking to his girlfriend, if you will."

When questioning resumed, the prosecutor again asked Chambers if Diaz had mentioned anything about what he and the other defendants had done to Cherry's bird. Chambers responded that Diaz said, "they killed the bird, too." The prosecutor then asked Chambers what Diaz specifically said about the bird, and Chambers responded, "That they killed the bird because the bird talked too much."

The prosecutor then asked Chambers if Diaz had said that "he went back to the house the next morning following the evening when you were all there[.]" Chambers responded, "Yes . . . . He said he went back. But he couldn't have went back because we was together." The prosecutor then asked Chambers if she made the following statement to the police: " 'But he said that when he went back the next morning that [Cherry] was face down. I was, like, did you check to see if he was alive or anything? He said no, I just picked up his stuff and came back out.' " Chambers confirmed that she made the statement.

The prosecutor also asked Chambers if Diaz had told her that "they had robbed" Cherry? Chambers responded, "Yes."

29

Later at trial, the prosecution sought to introduce portions of the recording of Chambers' August 18, 2011 interview with the police. Among the portions of the interview the prosecution sought to introduce was Chambers' description of Diaz's statement that he thought Moore, or "No Good," shot Cherry. Moore's counsel objected to that portion of the interview, arguing it would violate Moore's right of confrontation. The prosecutor argued, and the court agreed, that the statements were admissible under the Sixth Amendment because they were nontestimonial.

Before Chambers' interview was played, Moore's counsel again objected to the portion of the interview quoted above. He argued that the statement was inadmissible because it did not incriminate Diaz as an aider and abettor to Cherry's murder, but rather exposed him to substantially less criminal liability as an accessory after-the-fact to the murder. The court disagreed, finding the statement fell within Evidence Code section 1230's hearsay exception for declarations against penal interest. The court stated, "What is being stated [by Diaz to Chambers], if the statement is to be believed, he's admitting being present and things happening . . . . " Chambers' interview was later played for the jury.

## 2. Diaz's out-of-court statements do not implicate Moore's and Onley's right of confrontation

Moore and Onley argue the admission of Diaz's out-of-court statements violated their Sixth Amendment right of confrontation, relying on *Crawford v. Washington* (2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (*Crawford*), as well as *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (*Bruton*) (together, *Aranda/Bruton*). Specifically, they argue their right of confrontation was violated because Diaz could not be compelled to testify and his statements could not be tested through cross-examination. We disagree. The trial court correctly found that Diaz's statements did not implicate Moore's and Onley's right of confrontation because those statements were nontestimonial and outside the scope of the Sixth Amendment.

30

In *Bruton*, the United States Supreme Court held that the admission of a codefendant's out-of-court confession to a law enforcement officer that implicated the defendant in a joint trial violated the defendant's Sixth Amendment right of confrontation because the codefendant could not be compelled to testify. (*Supra*, 391 U.S. at pp. 127-128.) In reaching its conclusion, the court emphasized that the confession at issue was clearly inadmissible against the defendant as hearsay and that no recognized exception to the hearsay rules applied. (*Id*. at p. 128, fn. 3.) However, the court expressly declined to address whether admission of a codefendant's out-of-court statement that incriminates another defendant would implicate that defendant's right of confrontation where the statement falls within a recognized exception to the hearsay rules. (*Ibid*., fn. 3.) In *Aranda*, a case decided before *Bruton*, the California Supreme Court reached a similar conclusion on similar facts.[10] (*Aranda*, *supra*, 63 Cal.2d at p. 530.) Under the *Aranda*/*Bruton* line of cases, to admit a codefendant's out-of-court statement that implicates another defendant in the same trial, the prosecution must edit the statement in a manner that will not allow the jury to infer that it implicates the non-declarant defendant. (See *Fletcher*, *supra*, 13 Cal.4th at pp. 468-469.)

In *Crawford*, the United States Supreme Court significantly altered the analysis under the Sixth Amendment's confrontation clause, holding that the clause applies only to out-of-court statements that are "testimonial." (*Crawford*, *supra*, 541 U.S. at p. 51; see also *People v. Geier* (2007) 41 Cal.4th 555, 597.) The Court declined to precisely define what constitutes "testimony," but observed that it "is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.]" (*Crawford, supra,* at p. 51, 68.)

Since *Crawford* was decided, a number of decisions of the California Courts of Appeal have concluded that the *Aranda*/*Bruton* line of cases do not apply to

---

**10**     The holding in *Aranda* has since been abrogated by the "truth-in-evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) to the extent it excluded relevant evidence that would be admissible under the federal constitution. (See *People v. Fletcher* (1996) 13 Cal.4th 451, 465 (*Fletcher*).)

31

a codefendant's out-of-court statements implicating another codefendant if those statements are nontestimonial. (See e.g., *People v. Arceo* (2011) 195 Cal.App.4th 556, 571; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1401; see also *People v. Cervantes* (2004) 118 Cal.App.4th 162, 171-174.) Those courts agree that because the rule derived from *Aranda/Bruton* is concerned with protecting the non-declarant defendant's right of confrontation, the rule has no application where the out-of-court statement is nontestimonial, since such evidence does not implicate the Sixth Amendment. (See *Arceo*, *supra*, 195 Cal.App.4th at p. 571; *Arauz*, *supra*, 210 Cal.App.4th at p. 1401; see also *Cervantes*, *supra*, 118 Cal.App.4th at pp. 171-174 [because codefendant's out of court statement implicating other defendants was nontestimonial, traditional rules of hearsay, and not the Sixth Amendment, governed the statement's admissibility].) A number of federal courts have reached the same conclusion. (See e.g., *United States v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326 ["Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements"]; *United States v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85 [because *Bruton*'s analysis is premised on the presumption that the defendant who is implicated by his codefendant's out-of-court statement has a Sixth Amendment right to confront an adverse witness, *Bruton* does not apply if the codefendant's statement is nontestimonial].)

We agree that the *Aranda/Bruton* rule does not apply where a codefendant's out-of-court statement is nontestimonial, since the Sixth Amendment applies only to testimonial statements.[11] (See *Crawford*, *supra*, 541 U.S. at p. 51.) Accordingly, we focus our attention on whether Diaz's statements to Chambers are testimonial.

---

[11] Moore and Onley contend that the *Aranda/Bruton* rule still applies to a codefendant's nontestimonial out-of-court statement, citing *People v. Hajek and Vo* (2014) 58 Cal.4th 1144 and *People v. Garcia* (2008) 168 Cal.App.4th 261. In *Garcia*, which was decided before *Arceo* and *Arauz*, the court acknowledged that whether the *Aranda/Bruton* rule applies only to testimonial out-of-court statements was an "unsettled question," but it declined to reach the issue. (*Garcia*, *supra*, 168 Cal.App.4th at p. 282, fn. 12.) *Garcia* therefore does not stand for the proposition that the

32

As noted, the United States Supreme Court in *Crawford* did not precisely define what constitutes testimonial evidence. (*Crawford*, *supra*, 541 U.S. at p. 68.) The court did observe, however, that testimony is typically the type of statement made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." (*Id*. at p. 52.) This includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and [statements made during] police interrogations." (*Id*. at p. 68.) Statements made to friends, acquaintances, or family members, on the other hand, are generally nontestimonial. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 813 (*Gutierrez*) [casual remarks to an acquaintance are nontestimonial under *Crawford*]; *People v. Griffin* (2004) 33 Cal.4th 536, 579, fn. 13 (*Griffin*) [declarant's out-of-court statement made to friend at school was nontestimonial under *Crawford*], overruled on other grounds in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32 (*Riccardi*); *Cervantes*, *supra*, 118 Cal.App.4th at pp. 173-174.)

We find that Diaz's out-of-court statements to Chambers were nontestimonial. At the time Diaz made the statements, Chambers was his girlfriend, and there is nothing in the record to indicate that he would have expected Chambers to later relay the statements to law enforcement or testify about them at trial. (See *Cervantes*, *supra*,

---

*Aranda*/*Bruton* line of cases continues to apply to nontestimonial out-of-court statements following *Crawford*. (See *People v. McGraw-Hill Companies*, *Inc.* (2014) 228 Cal.App.4th 1382, 1390 ["An opinion is not authority for propositions not considered"].) In *Hajek*, the California Supreme Court held that the admission of a codefendant's nontestimonial statement that incriminated the defendant did not violate *Crawford* or the rule derived from *Aranda* and *Bruton*. (*Hajek*, *supra*, 58 Cal.4th at pp. 1203-1204.) However, the court's analysis of the statement under *Aranda* and *Bruton* was confined to a single paragraph in which the court did not specifically address whether nontestimonial out-of-court statements are subject to the rule. (See *Hajek*, *supra*, at p. 1204.) Therefore, *Hajek* also does not stand for the proposition that the *Aranda*/*Bruton* line of cases continues to apply to nontestimonial out-of-court statements. (See *McGraw-Hill Companies*, *Inc.*, *supra*, 228 Cal.App.4th at p. 1390.)

118 Cal.App.4th at pp. 173-174.) Accordingly, the statements do not trigger Moore's and Onley's Sixth Amendment right of confrontation.

### 3. The trial court properly admitted Diaz's statements as declarations against penal interest[12]

Evidence Code section 1230[13] allows a party to introduce an out-of-court statement for its truth if the statement was against the declarant's penal interest at the time it was made. (*People v. Geier, supra,* 41 Cal.4th at p. 587.) " 'There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]' [Citation.]" (*Arauz*, *supra*, 210 Cal.App.4th at p. 1400.) "[A] hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 612.) " '[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context.' [Citation.]" (*Ibid.*) We review the trial court's decision to admit an out of court statement as a declaration against penal interest for abuse of discretion. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1110.)

---

[12] Moore raised the argument in his opening brief, and Onley filed a supplemental brief joining in Moore's argument.

[13] Evidence Code section 1230 provides in its entirety: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

Moore and Onley contend that Diaz's statements about the robbery were not specifically disserving of Diaz's penal interest because Chambers testified that Diaz had said "they" robbed Cherry and killed his bird. Moore and Onley interpret the word "they" in Chambers' testimony to mean that Diaz told her that Moore and Onley, and not Diaz, participated in the robbery.

Looking at the context in which Diaz's statements were made, we disagree with Moore and Onley's interpretation of the word "they" and conclude the trial court did not abuse its discretion in finding Diaz's statements incriminated not only Moore and Onley, but also Diaz. Chambers testified that she saw Onley and Moore enter Cherry's house shortly after Diaz instructed her to go outside. While Chambers was outside, sounds like gunshots were heard coming from the area of Cherry's house. Shortly thereafter, Chambers saw Diaz, Moore, and Onley walk out of Cherry's house together, each carrying a bag or pillow case that appeared to be filled with items. Diaz and Chambers then got in the same car and drove away together. When viewed in this context, it is clear Diaz was aware that Chambers knew he was inside Cherry's house when defendants robbed and killed Cherry. Accordingly, when he told Chambers that "they" had robbed Cherry and killed his bird, he confirmed his participation in those crimes.

Moore and Onley also contend Diaz's statements that Diaz thought Moore shot Cherry and that Onley and Moore "made [him] leave" Cherry's house should have been excluded because they were self-serving--i.e., Diaz had tried to deflect the blame for Cherry's murder. We disagree. Although Diaz told Chambers that Moore, and not Diaz, had shot Cherry, that does not mean the statement was exculpatory or self-serving. Again, when viewed in the context of the other evidence, Diaz's statements exposed him to the same liability as Moore and Onley. When Diaz made the statement to Chambers, he knew that she was aware he had participated in the robbery of Cherry. By telling Chambers that one of his co-participants had shot Cherry during the robbery, Diaz admitted to liability for felony-murder. Accordingly, a reasonable person would not have made that statement unless he knew that it was true.

35

We also conclude that Diaz's statements to Chambers were reliable and trustworthy. Diaz made the statements in confidence to his girlfriend. There is nothing in the record to indicate that he was aware any investigation into Cherry's murder had begun, or that Cherry's body had even been discovered, by the time he made the statements. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 [in determining the trustworthiness of statements, "the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others" and "the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures"].)

## IV. The Trial Court Did Not Err in Allowing the Prosecution to Play Portions of Chambers' Recorded Police Interview to the Jury[14]

Defendants contend the court erred in allowing the prosecution to play portions of Chambers' interview with the police for the jury. Specifically, defendants assert that the statements contained in the interview did not qualify as prior consistent statements under Evidence Code sections 791 and 1236 because Chambers had developed a motive to fabricate details about Cherry's murder before the interview, and because defendants did not elicit inconsistent statements from Chambers to attack her credibility.

### 1. Relevant proceedings

During opening statements, defense counsel suggested that Chambers repeatedly had changed her recollection of events and fabricated details about Cherry's murder to protect her own interests. For example, counsel for Diaz alleged that during her August 18, 2011 interview with the police, Chambers realized that she could be criminally prosecuted for Cherry's murder, causing her to "immediately break down" and start "spilling stuff." Counsel for Diaz also asserted that Chambers' version of events surrounding Cherry's murder improved each time she spoke to the police.

---

[14] Moore raised the issue in his opening brief. Onley joined in Moore's argument through his supplemental brief, and Diaz joined in Moore's argument through his opening brief.

36

Finally, counsel for Diaz told the jury that Chambers had an incentive to cooperate with the prosecution because the prosecution had helped her relocate.

Counsel for Onley also asserted during opening statements that Chambers continued to change the details surrounding Cherry's murder to support the prosecution's theory as the case progressed toward trial. He stated, "Ms. Chambers gives a story that gets her out of trouble, and then comes to court -- actually, gives the story again, and the story gets better, and then comes to court and the story gets better. And then we'll come here, and we expect that the story will get better, both because she's changing it and she has more practice and experience from the witness stand."

Before defendants finished cross-examining Chambers, Onley filed a motion to exclude Chambers' entire August 18, 2011 interview with the police, arguing the interview was inadmissible under Evidence Code sections 352, 791, 1235 and 1236. He argued that the interview was not admissible as a prior consistent or inconsistent statement, since Chambers had yet to be impeached by defendants or the prosecution. Onley also filed a list of supplemental objections, in which he objected to specific portions of the interview. Onley identified the portions of the interview he was objecting to by the line and page number of the interview transcript, stating that he objected to those portions on "other relevance and hearsay grounds, [Evidence Code section] 352, asked and answered, and cumulative."

The court conducted a hearing on Onley's motion. It rejected Onley's argument that the entire interview was inadmissible, finding counsel for Diaz's and counsel for Onley's remarks about Chambers' credibility, potential bias, and motivation to fabricate testimony during opening statements opened the door for portions of the interview to be introduced as prior consistent statements under Evidence Code sections 791 and 1236. However, the court ruled that the prosecution could not play the admissible portions of the interview until after defendants cross-examined Chambers.

The court then ruled on Onley's specific objections to the interview. The court sustained several of Onley's objections and allowed the prosecution to play the

remaining portions of Chambers' interview for the jury. After the court ruled on Onley's objections, Moore joined in Onley's motion to exclude Chambers' interview.

After Chambers finished testifying, counsel for Onley again objected to the prosecution playing portions of the interview to the jury. The court again overruled Onley's objections.

### 2. Analysis

Under Evidence Code sections 791 and 1236, a witness's consistent out-of-court statements are admissible for their truth if they are offered "(1) after an inconsistent statement is admitted to attack the testifying witness's credibility, where the consistent statement was made before the inconsistent statement, or (2) when there is an express or implied charge that the witness's testimony recently was fabricated or influenced by bias or improper motive, and the statement was made prior to the fabrication, bias, or improper motive." (*Riccardi*, *supra*, 54 Cal.4th at p. 802; Evid. Code, § 791 [delineating the two circumstances when prior consistent statements may be admitted]; Evid. Code, § 1236 [prior consistent statements are not made inadmissible by the hearsay rule if they are offered in compliance with Evidence Code section 791].)

The trial court found that the portions of Chambers' interview played for the jury were admissible under Evidence Code sections 791 and 1236 because, during opening statements, defendants had stated Chambers fabricated testimony about the events surrounding Cherry's murder. (See Evid. Code, § 791, subd. (b).) Defendants do not contest that they alleged Chambers fabricated testimony, but contend that her motivation to fabricate testimony arose before speaking to the police during the interview. They argue that when Chambers was arrested for murder prior to the interview, she would have become aware that she was a suspect in the investigation of Cherry's death. From that point on, she would have had a motive to fabricate details about Cherry's murder that incriminated defendants and minimized her own culpability. Because Chambers made the statements after she was arrested and had a motive to lie, defendants argue that no part of her interview was admissible as a prior consistent statement. (See Evid. Code, § 1236, subd. (b); see also *People v. Coleman* (1969)

38

71 Cal.2d 1159, 1166, overruled on other grounds by *Garcia v. Superior Court* (1997) 14 Cal.4th 953.)

A prior consistent statement must have been made before a charged motivation to lie developed. (See *Riccardi*, *supra*, 54 Cal.4th at p. 802.) However, in cases where more than one motivation to lie is charged, the prior consistent statement is admissible so long as it was made before "any one or more of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony." (*People v. Hayes* (1990) 52 Cal.3d 577, 609; *People v. Jones* (2003) 30 Cal.4th 1084, 1106-1107 (*Jones*).)

*Jones* is directly on point. In that case, the prosecution introduced a prior consistent statement made by a witness to the police to rehabilitate the witness's credibility after the defendant presented evidence of the witness's favorable plea bargain. (*Jones*, *supra*, 30 Cal.4th at p. 1106.) The defendant argued the statement was inadmissible because the witness had developed a motive to lie after he was first contacted by the police about the defendant's crime, which occurred before he made the statement. (*Ibid*.) The prosecution did not dispute that the witness could have had a motive to lie after he was contacted by the police, but argued the witness's statement nevertheless was admissible because it was made before another one of the grounds the defendant claimed had motivated the witness to lie developed, namely entering into a plea bargain with the prosecution. (*Ibid*.)

The California Supreme Court upheld the admission of the witness's prior consistent statement. (*Jones*, *supra*, 30 Cal.4th at p. 1107.) The court observed that "the focus under Evidence Code section 791 is the specific agreement or other inducement suggested by cross-examination as supporting the witness's improper motive." (*Id*. at p. 1107.) Because the statement was made before at least one of the grounds that defendant alleged had motivated the witness to lie had developed, the statement was admissible as a prior consistent statement. (*Ibid*.)

Similar circumstances to those in *Jones* are present here. During opening statements and Chambers' cross-examination, defendants attacked Chambers'

credibility by charging that she had at least two motivations to lie: the first arising after she was arrested in connection with Cherry's murder on August 18, 2011; and the second arising after she received assistance from the police to relocate. While Chambers' arrest occurred before her interview, she did not receive assistance to relocate until after the interview. Accordingly, any motivation Chambers had to lie based on receiving support from the police to relocate would not have developed until after the interview. (See *Jones*, *supra*, 30 Cal.4th at pp. 1106-1107.) Thus, the trial court did not err in allowing the prosecution to play portions of Chambers' police interview under Evidence Code sections 791 and 1236, since that interview occurred before one of the grounds for fabrication charged by defendants had developed. (See *Jones*, *supra*, 30 Cal.4th at p. 1107.)

## V. The Trial Court Did Not Err in Excluding Third-Party Culpability Evidence[15]

Defendants next contend the court erred in excluding proposed testimony from Thompson, Cherry's neighbor, that she saw two bald-headed males and Chambers drive by Cherry's house on the morning of January 23, 2011. They argue the testimony was exculpatory and could have raised a reasonable doubt as to their guilt because it supported their theory that someone else killed Cherry. Specifically, they argue that had the evidence been admitted, the jury could have found that the two bald-headed males were preparing to murder Cherry later that day.

### 1. Relevant proceedings

After Thompson testified, counsel for Diaz requested to call her back to the stand to elicit additional testimony that he had not previously been aware she could provide. Thompson had apparently seen Chambers and two bald-headed men drive by Cherry's house in a car with hydraulics on the morning of January 23, 2011. Counsel for Diaz argued that the testimony was significant because it could establish that the two men

---

[15] Moore raised the issue in his opening brief. Onley joined in Moore's argument through his supplemental brief, and Diaz joined in Moore's argument through his opening brief.

were "casing" the house to murder Cherry later that day. He argued that based on Thompson's proposed testimony, the jury could find that someone other than defendants murdered Cherry on January 23, 2011. Onley's counsel joined in the request to admit Thompson's testimony, arguing that the evidence was relevant to the issue of whether defendants murdered Cherry.

The prosecutor argued that Thompson's testimony should be excluded. She noted that Thompson did not observe the men stop or park their car in front of Cherry's house, or see them carrying, or driving with, any weapons. The court denied the request, calling defendants' theory that the two men were "casing" Cherry's house a "long stretch." The court found that the testimony would not establish anything more than that someone other than defendants had a "mere opportunity and motive" to murder Cherry, and, as a result, would not raise a reasonable doubt as to defendants' guilt.

### 2. Legal principles

To be admissible, third-party evidence does not need to establish a "substantial proof of a probability" that someone other than the defendant committed the crime. (*People v. Adams* (2004) 115 Cal.App.4th 243, 252 (*Adams*).) Rather, the evidence need only be capable of raising a reasonable doubt about the defendant's guilt. (*Ibid.*) This does not mean, however, that any evidence, no matter how remote, must be admitted to show a third party's possible culpability. (*Ibid.*) " '[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citations.]" (*Ibid.*)

In determining whether to admit third-party culpability evidence, the trial court must conduct a two-part test: first, it must determine whether the evidence could raise a reasonable doubt as to the defendant's guilt; second, it must determine whether the evidence is more probative than prejudicial under Evidence Code section 352. (*Adams*,

41

*supra*, 115 Cal.App.4th at p. 252.) We review the trial court's determination to exclude third-party culpability evidence for abuse of discretion. (*Ibid.*)

### 3. Analysis

The court did not abuse its discretion in excluding Thompson's proposed testimony. Her testimony only would have shown that two bald-headed men and Chambers had driven past Cherry's house the day after defendants robbed him. Thompson did not identify the men, and there is nothing in the record to suggest she saw them engage in any suspicious activity. Thompson did not see the men stop in front of Cherry's house or drive by Cherry's house several times, and she did not see them carrying weapons. Although Whitmore had testified that she believed the two men whom she struggled with at Cherry's house were bald, there is no indication that those were the same two men Thompson saw drive by Cherry's house. At most, Thompson's testimony could have established that the two men who drove by Cherry's house on the morning of January 23, 2011 had an opportunity to murder Cherry insofar as they were in Cherry's neighborhood, but that is not sufficient to render her testimony admissible as third-party culpability evidence. (See *Adams*, *supra*, 115 Cal.App.4th at p. 252.)

## VI. The Trial Court Did Not Err in Allowing the Prosecution's Cell-Phone Expert to Testify[16]

Defendants contend the court erred in failing to exclude the testimony of the prosecution's cell-phone expert because the prosecution produced the slides that the expert intended to rely on only a day before the expert testified.

### 1. Relevant proceedings

On May 9, 2014, during the prosecution's case-in-chief, counsel for Diaz filed a motion raising several alleged discovery violations by the prosecution. He complained that the prosecution had waited until the first day of voir dire to produce a witness list and about 700 pages of witness interview transcripts. He also complained

---

[16] Diaz raised the issue in his opening brief. Moore and Onley joined in Diaz's argument through their supplemental briefs.

that the prosecution had yet to provide defendants with the qualifications and training for its cell-phone expert, and that the prosecution did not produce two slides that the expert intended to use while testifying about the records for the cell phones used in connection with Cherry's murder until May 8, 2014, the day before the prosecution intended to call the expert as a witness.

The prosecutor replied that defendants had received all of the information contained in the expert's slides more than a year before trial began. Counsel for Diaz acknowledged that the information represented in the slides was contained in the cell-phone records defendants had received more than a year before trial, but he complained that the records were virtually impossible to decipher without the expert's slides because the records contained thousands of phone numbers with no information identifying the numbers' subscribers.

The court then asked counsel for Diaz why he or the other defense attorneys had never sought the prosecution's assistance in deciphering the records before trial. Counsel for Diaz responded that he did not become aware that one of the numbers belonged to Desiree Sherlock, who's phone had been stolen by Moore and later used by him in connection with Cherry's murder, until the first day of voir dire, when the prosecution turned over a transcript of the interview in which she identified her phone number. Counsel for Diaz acknowledged, however, that the prosecution had turned over the recording of Sherlock's interview before trial, but he complained that he had had difficulty understanding the interview until he received the transcript. The court responded, "the problem is you had this information. If you couldn't decipher it, as I said it before, you should have brought it to the court's attention, brought it to the D.A.'s attention, said 'what does this mean?' You all announced ready for trial. That is where we stand at this point. But to say – [¶] I was under the impression that you're coming in here this morning and saying 'at 6:30 last night, I received new discovery,' and now you're bringing in a fact that you've had this discovery, but you've never known – never been directed by the D.A. what exactly it meant, where to look, and how [the prosecution was] going to use it."

43

After the parties and the court discussed further the extent to which the information from the cell-phone records was summarized in the expert's slides, counsel for Diaz withdrew his motion raising the alleged discovery violations by the prosecution. Neither counsel for Moore, nor counsel for Onley, moved to exclude the cell-phone expert's testimony based on a discovery violation.

### 2.  Analysis

As a preliminary matter, defendants failed to preserve for appeal a challenge to the court's admission of the prosecution's cell-phone expert's testimony. Although counsel for Diaz filed a motion raising alleged discovery violations by the prosecution concerning how the prosecution produced its cell-phone evidence, he withdrew that motion before the court could rule on it. In addition, neither counsel for Onley, nor counsel for Moore, filed their own discovery motions or raised their own discovery objections concerning the prosecution's handling of the cell-phone evidence during trial. Accordingly, defendants never requested the court to make a ruling on the admissibility of the cell-phone expert's testimony. Thus, defendants did not preserve for appeal any claim that the court erred in admitting the cell-phone expert's testimony based on the prosecution's alleged discovery violations. (See *Waidla*, *supra*, 22 Cal.4th at p. 717 [generally questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal].)

In any event, assuming defendants preserved the issue for appeal, we conclude the court did not abuse its discretion in admitting the cell-phone expert's testimony. The only alleged discovery violation defendants complain of is the prosecution's turning over of the expert's slides that summarized portions of the cell-phone records shortly before the expert testified.[17] Defendants argue they were unable to prepare an

---

[17]     Although Diaz refers to other alleged discovery violations in the summary of the relevant proceedings in his opening brief, neither Diaz, nor any other defendant, set forth any argument addressing those alleged violations and any prejudice they may have caused defendants.

adequate defense to the prosecution's cell-phone evidence because the cell-phone records were virtually undecipherable until they received the expert's slides. As a result, defendants contend the court should have excluded the cell-phone expert's testimony.

Defendants do not dispute, however, that they had received the cell-phone records that formed the basis for the expert's slides more than a year before trial. They also do not contend that the expert's slides contained new information that the prosecution had not previously disclosed. Accordingly, defendants do not claim that the prosecution withheld any evidence that had not previously been disclosed. Rather, they argue that the prosecution should have turned over the slides at an earlier time because they were unable to understand the content of the cell-phone records until they received the slides. Without the slides, defendants claim they could not adequately prepare for the expert's cross-examination.

Defendants essentially argue that the prosecution failed to help them decipher the cell-phone records in a timely manner. This claim lacks merit. It is well settled that the prosecution has no duty to assist a defendant's investigation. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1049.) "If the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial . . . . " (*Id*. at p. 1049.) Defendants obtained the cell-phone records summarized in the expert's slides well over a year before the cell-phone expert testified. They therefore had more than adequate time to review the records, obtain any assistance necessary to decipher the records, and prepare for any testimony based on the content of those records. Thus, there was no discovery violation, and the court properly admitted the cell-phone expert's testimony.

## VII. The Trial Court Did Not Err in Failing to Strike Detective Mun's Testimony[18]

Defendants contend the court erred in failing to strike portions of rebuttal testimony by Detective Mun concerning a conversation he had with Gardner, one of Cherry's neighbors, in the courthouse following Gardner's testimony. They argue that because Mun could not produce his notes from that conversation, which he had reviewed before testifying on rebuttal, the court should have stricken his testimony under Evidence Code section 771. We conclude any error by the trial court in failing to strike Mun's testimony was harmless because Mun did not testify about any details of the conversation he had with Gardner.

Mun testified as a rebuttal witness for the prosecution. He had interviewed Thompson and Gardner after they testified after he discovered that counsel for Diaz had interviewed the witnesses together during trial. Mun testified about the content of his interview with Thompson, but he did not testify about the content of his interview with Gardner. In fact, he testified that he did not know any information about Gardner.

During cross-examination, counsel for Diaz asked Mun if he had taken notes during his interview with Gardner. Mun testified that he had taken notes and that he had shown them to the prosecution before testifying.

Counsel for Moore then asked Mun if he had used his notes to prepare for his testimony. Mun testified that he had reviewed his notes and used them to refresh his recollection. When counsel for Moore asked if he could look at Mun's notes, Mun replied that he could not find them. Counsel for Moore then moved to strike Mun's testimony concerning his interview with Gardner under Evidence Code section 771.[19] The court denied Moore's motion.

---

[18] Diaz raised the issue in his opening brief. Moore and Onley joined in Diaz's argument through their supplemental briefs.

[19] Diaz and Moore also contend the court erred in failing to strike Mun's testimony under Evidence Code section 721, which governs the scope of an expert witness's cross-examination. Diaz and Moore do not cite to any authority, however, for the

46

Evidence Code section 771, subdivision (a) provides in relevant part: "[I]f a witness, either while testifying or prior thereto, uses a writing to refresh his memory with respect to any matter about which he testifies, such writing must be produced at the hearing at the request of an adverse party and, unless the writing is so produced, the testimony of the witness concerning such matter shall be stricken." Even if we assume the court should have stricken Mun's testimony that he had interviewed Gardner, defendants have failed to demonstrate that they were prejudiced in any way by the court's failure to do so because Mun did not testify about any of the details of that interview.

Here, defendants argue that it is reasonably probable the jury would have reached a more favorable verdict had the court stricken Mun's testimony because Gardner was a favorable witness to the defense, and the prosecution had attacked her credibility throughout trial. They assert that had Mun's notes been produced, their trial counsel could have impeached Mun's testimony, which could have bolstered Gardner's credibility. Defendants' arguments lack merit because they do not explain how reviewing Mun's notes could have allowed them to impeach him about his interview with Gardner. Mun never testified about any of the details of his conversation with Gardner. Accordingly, the prosecution did not elicit any testimony from him that could have impacted Gardner's credibility. As a result, there was no reason to impeach Mun with respect to his testimony concerning his interview with Gardner. For the same reasons, defendants fail to demonstrate how striking Mun's testimony would have affected their ability to bolster Gardner's credibility at trial.

---

proposition that Mun's testimony should have been stricken under Evidence Code section 721. Accordingly, they have failed to demonstrate that the court committed any error under that code section. In any event, because they did not object at trial to Mun's testimony under Evidence Code section 721, Diaz and Moore have forfeited any claim of error on that ground. (See *Waidla*, *supra*, 22 Cal.4th at p. 717.)

**VIII. Sufficient Evidence Supports the Jury's Finding that Defendants Killed Cherry[20]**

Defendants contend insufficient evidence supports their murder convictions, arguing the prosecution failed to prove that they killed Cherry. They argue that based on the testimony of several of Cherry's neighbors who claimed to have seen and spoken to Cherry on January 23, 2011, a reasonable jury could not have found Cherry died as a result of defendants' robbery and burglary. They also attack the prosecution's evidence. They point out that the prosecution failed to produce any definitive medical evidence establishing that Cherry had died more than 24 hours before his body was found. They also assert that Chambers and Whitmore, who provided key eyewitness testimony establishing defendants' participation in the robbery and murder, were unreliable. We conclude substantial evidence supports the jury's finding that Cherry was killed during the commission of defendants' robbery and burglary.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.) In determining whether there was sufficient evidence to support a jury's finding, we must determine whether, after reviewing the entire record in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Ibid.*) We neither reweigh evidence nor reevaluate the credibility of witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) " 'This standard applies whether direct or circumstantial evidence is involved.' " (*Avila*, *supra*, 46 Cal.4th at p. 701.)

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence." (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "Although

---

[20]     Diaz raised the issue in his opening brief. Moore and Onley joined in Diaz's argument through their supplemental briefs.

it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citations.]" (*Id*. at pp. 507-508.) " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]' " (*Id*. at p. 508.) Therefore, before we may set aside the judgment, it must be clear that " 'upon no hypothesis whatever is there sufficient evidence to support it.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Although neither the coroner nor the medical examiner could establish an exact time of death, they both testified that, based on their examination of Cherry's body and the conditions in which it was found, Cherry could have died on January 22, 2011, the night defendants robbed him. The coroner opined that Cherry could have died between 24 and 48 hours before his body was found, and the medical examiner opined that Cherry died between 10 and 48 hours before his body was found, both establishing a possible time of death within the time defendants robbed him. Based on this evidence, the jury reasonably could have concluded that Cherry had died on the evening of January 22, 2011.

A finding that Cherry died during defendants' robbery and burglary is further supported by Chambers' and Whitmore's testimony. Chambers and Whitmore testified that on the evening of January 22, 2011, less than 48 hours before Cherry's body was found, they saw Moore and Onley enter Cherry's house while Diaz was still inside. Shortly after Moore and Onley entered the house, Whitmore heard what sounded like gunshots come from inside Cherry's house. Shortly after Whitmore heard the gunshots, Chambers saw Diaz, Moore, and Onley walk out of Cherry's house together. After the robbery and burglary, Diaz told Chambers that Moore had shot Cherry. He also told her that he had returned to Cherry's house after the robbery, where he found Cherry's body lying face down.

49

Defendants contend that a reasonable jury would not have relied on Chambers' testimony because she lacked credibility due to her potential involvement in Cherry's murder and her willingness to cooperate with the prosecution. This argument is not persuasive. Chambers was subjected to thorough cross-examination during which defense counsel questioned her about the truthfulness of her statements and any motivation she may have had to testify on behalf of the prosecution. In addition, the jury was properly instructed on how to evaluate a witness's credibility, a witness's statements made prior to trial, and conflicting evidence. In applying these standards, the jury decided to believe Chambers' testimony. We will not second guess that decision on appeal. (See *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts"].)

Finally, testimony from members of Cherry's family supports a finding that Cherry died on the evening of January 22, 2011. Cherry's mother testified that she talked to Cherry every day on the phone; however, the last time she spoke to him was during the day on January 22, 2011. In addition, Cherry did not attend his son's birthday party on January 23, 2011, which he had helped plan and promised to attend. Cherry also did not respond to any of his sister's phone calls on January 23, 2011, and he did not answer the door to his house when his brother came to check on him. In light of this evidence, the jury reasonably could have concluded Cherry was killed during the commission of defendants' robbery and burglary.

## IX. The Felony-Murder Special Circumstance Enhancement Is Not Unconstitutionally Vague[21]

Moore and Onley contend the felony-murder special circumstance enhancement, which imposes a sentence of death or life imprisonment without the possibility of parole for a murder committed during a felony, is unconstitutionally vague. (See § 190.2, subd. (a)(17).)  They argue there is no distinction between the elements necessary to establish the special circumstance enhancement and the substantive crime of felony murder, which imposes only a sentence of 25 years to life with possibility of parole in the absence of a special circumstance finding.  Defendants contend that the lack of distinguishing elements between the enhancement and substantive crime renders the enhancement unconstitutional because the prosecution may arbitrarily choose to pursue a sentence of death or life without possibility of parole, rather than a sentence of life with possibility of parole.

To withstand a vagueness challenge, a criminal statute must " ' "be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt." ' [Citations.]" (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567.)  In other words, a statute "must be definite enough to provide notice about what conduct is prohibited, and to provide standards for its application and adjudication to avoid arbitrary and discriminatory enforcement." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 79-80 (*Andreasen*).)

Section 189 codifies the substantive crime of felony murder.  It provides that a person is guilty of first-degree murder if he commits murder while perpetrating, or attempting to perpetrate, among other enumerated felonies, a robbery or burglary. (§ 189.)  Section 190 establishes the possible sentences for first-degree murder.  It

---

[21]  Moore raised the issue in his opening brief.  Onley joined in Moore's argument through his supplemental brief.  In his opening brief, Diaz did not request to join in Moore's argument challenging the felony-murder special circumstance enhancement.  Nor did he articulate any reasons why Moore's argument applies to him.  Accordingly, Diaz has failed to join in Moore's argument challenging the felony-murder special circumstance enhancement.  (See *People v. Bryant* (2014) 60 Cal.4th 335, 363.)

provides: "Every person guilty of murder in the first degree shall be punished by death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life." (§ 190, subd. (a).) Which of the three possible sentences may be imposed is determined by certain statutory provisions, including section 190.2, the enhancement statute challenged here. (See § 190, subd. (a).) The enhancement statute provides in relevant part: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if . . . . [¶] The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit . . . . [¶] Robbery . . . . [or] [¶] (G) Burglary in the first or second degree. . . . " (§ 190.2, subd. (a)(17)(A)&(G).)

We reject defendants' contention that the enhancement is unconstitutionally vague. Sections 189, 190, and 190.2, subd. (a)(17) provide clear notice to a defendant of what type of criminal conduct will render him eligible for the death penalty or life imprisonment without the possibility of parole. (*Andreasen*, *supra*, 214 Cal.App.4th at p. 80.) Specifically, the statutes put a defendant on notice that if he commits a murder while committing, or attempting to commit, an enumerated felony, he could be subjected to either of the two enhanced punishments. (*Ibid*.) Moreover, the fact that the prosecution has discretion to choose whether to pursue the death penalty, life imprisonment without the possibility of parole, or an indeterminate term with the possibility of parole in cases that fall within the enhancement's scope does not create an improper risk of arbitrary enforcement of the enhancement. (See *Andreasen*, *supra*, 214 Cal.App.4th at p. 80.) Where a statute sufficiently narrows the class of defendants to which the death penalty applies, as section 190.2 does, no constitutional infirmity is created by affording the prosecution discretion to determine in which of those cases the death penalty should be sought. (See *People v. Earp* (1999) 20 Cal.4th 826, 905.)

Defendants' vagueness challenge also fails because there is a distinction between the felony-murder special circumstance enhancement and the substantive crime of

felony murder. The California Supreme Court repeatedly has held that for the special circumstance enhancement to apply, the prosecution must establish not only that the murder resulted during the commission, or attempted commission, of an enumerated felony, but also that the defendant harbored a felonious intent independent of the murder. (See *Riccardi*, *supra*, 54 Cal.4th at pp. 836-837; *People v. Davis* (2009) 46 Cal.4th 539, 609; *People v. Green* (1980) 27 Cal.3d 1, 61, abrogated on other grounds by *People v. Martinez* (1999) 20 Cal.4th 225; see also *Andreasen*, *supra*, 214 Cal.App.4th at p. 81.) In other words, the enhancement does not apply if the defendant had only the intent to kill, and the underlying felony was "merely 'incidental or ancillary to the murder.' " (*Davis*, *supra*, 46 Cal.4th at p. 609.) Such an independent felonious intent is not required to establish only the substantive crime of felony murder.

The distinction between the special circumstance enhancement and the substantive crime is illustrated by the instructions provided to the jury in this case. The court instructed the jury with CALJIC 8.81.17 (the enhancement instruction), which explains what the prosecution must prove to establish the special circumstance enhancement, and CALJIC 8.21 (the felony murder instruction), which explains what the prosecution must prove to establish the substantive crime of felony murder. The enhancement instruction requires the jury to find  that the murder "was committed in order to carry out or advance the commission of Robbery [or Burglary] or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance . . . is not established if the Robbery [or Burglary] or attempted robbery [or attempted burglary] was merely incidental to the commission of the murder." The felony murder instruction, however, does not require such a finding. Rather, it requires only that the jury find the murder occurred "during the commission or attempted commission of the crime of robbery or burglary." Although the felony murder instruction requires the jury to find defendants had the specific intent to commit robbery or burglary, it does not require the jury to find that defendants' intent to commit one of those crimes was independent of, or not merely incidental to, defendants' intent to kill the victim. Accordingly, as applied in this case, the special circumstance enhancement

53

requires additional findings than those required for the substantive crime of felony murder.

## X. The Prosecutor Did Not Engage in Misconduct[22]

Defendants contend the prosecutor engaged in misconduct when she stated that Cherry was a devoted father, brother, and son, and that he spoke to members of his family on a daily basis. They argue the prosecutor's comments were improper because they appealed to the jury's sympathy and emotions by inviting the jury to focus on Cherry's close relationship with his elderly mother and decide the issue of guilt based on Cherry's "admirable qualities as a son and family man."

### 1. Relevant proceedings

Near the beginning of her closing argument, the prosecutor discussed Cherry's relationship with his family. She stated, "You learned that [Cherry] was a devoted father, brother, and son. We heard from his family members how dedicated he was to his family, how frequently he spoke with them, and what he did for them on a daily basis." Onley's counsel then objected to the prosecutor's argument on the grounds that it appealed to the jury's sympathy.[23] The court overruled the objection, and the prosecutor went on: "He talked to his mother on the phone multiple times per day. Not only did she testify to that, but when you see the telephone records, you'll see how frequently he was in contact with his family."

---

[22]    Moore raised the issue in his opening brief. Onley joined in Moore's argument through his supplemental brief, and Diaz joined in Moore's argument through his opening brief.

[23]    The People contend Moore forfeited any challenge on appeal to the prosecutor's argument because his counsel did not separately object to the argument or join in the objection raised by Onley's counsel. We conclude Moore did not forfeit his challenge to the prosecutor's argument because any objection by his counsel would have been futile, given that the court overruled Onley's objection and the argument objected to concerned the victim's character, an issue that affected Onley and Moore equally. Because Moore's counsel did not forfeit Moore's challenge on appeal to the prosecutor's argument, we do not need to address Moore's contention that his counsel rendered ineffective assistance by failing to preserve the challenge for appeal.

The prosecutor then briefly discussed how Cherry sold clothing, compact discs, and other items out of his apartment, before returning to the topic of how frequently Cherry talked to his family members. The prosecutor then talked about the events surrounding the day on which the prosecution argued Cherry had died. She stated, "And this particular weekend in question was a very important weekend for [Cherry's] family in that they were supposed to have a birthday party for [Cherry's] son, whom he loved very much. And according to even a defense witness, he would do anything for his children. [¶] Now, his behavior dramatically changed on January 22, 2011, because he was dead, as the evidence will show. The dramatic change in his typical behavior is seen in the circumstantial evidence. [¶] He had no communication with his family, on the phone, after 8:12 p.m., nor anyone else, on January 22, 2011. He had two cell phones, both of which he used actively." The prosecutor referred to cell-phone evidence showing that, before his death, Cherry spoke on the phone to his mother multiple times per day, and that he frequently spoke on the phone to his siblings and his son. She also referenced cell-phone evidence showing that Cherry had stopped communicating with his family around the time defendants had entered his apartment. The prosecutor argued that this evidence helped establish that Cherry was killed on the night defendants entered his apartment.

### 2. Legal principles

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819.)

A prosecutor enjoys wide latitude during closing argument. (*People v. Williams* (1997) 16 Cal.4th 153, 221.) Her argument may be vigorous and incorporate

appropriate epithets as long as it amounts to fair comment on the evidence, and it may include reasonable inferences drawn for the evidence. (*Ibid.*) "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' " (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.)

### 3. Analysis

The prosecutor did not engage in misconduct. Her comments concerning Cherry's close relationship and frequent contact with his family members were based on facts in evidence. The prosecutor has a wide-ranging right to discuss the facts in evidence, and she is not limited to discussing those facts in "clinical or detached detail." (*People v. Panah* (2005) 35 Cal.4th 395, 463 (*Panah*).)

Further, the prosecutor's comments addressed one of the most important and contested issues the prosecution needed to establish to prove defendants' guilt, namely the date on which Cherry died. Throughout defendants' trial, the prosecution took the position that Cherry died on January 22, 2011, the night defendants robbed him and burglarized his apartment, while defendants took the position that Cherry was still alive after January 22, 2011, and that someone other than defendants killed him. The prosecutor commented on Cherry's relationship with his family and his frequent contact with his mother and other family members to counter defendants' theory of when Cherry died. The prosecutor argued that based on Cherry's history of contacting his family members on a daily basis, the evidence that he stopped contacting them on January 23, 2011 supported the prosecution's theory that he had been killed on January 22, 2011. The prosecutor's comments on Cherry's familial relationship fell well within her right " 'to fully state [her] views as to what the evidence shows and to urge whatever conclusion [she] deems proper.' " (*Panah*, *supra*, 35 Cal.4th at p. 463.)

56

**XI.    The Court Did Not Err When it Advised the Jury that Defendants'
Case Did Not Involve the Death Penalty[24]**

Defendants next contend the trial court erred in advising the jury during voir dire
that this case did not involve the death penalty.  They argue the advisement was
prejudicial because it advised the jury of the consequences of its verdict, thereby
distracting the jury from its task of determining guilt and relieving the prosecution of its
full burden of proving guilt.

**1.    Relevant proceedings**

Before voir dire, Moore filed a motion in limine seeking an order precluding the
prosecution from advising prospective jurors that this case did not involve the death
penalty.  Moore argued such an advisement would improperly encourage jurors selected
to serve on this case to consider the possible punishment that defendants could receive if
found guilty.  Before calling the first jury panel, the court denied Moore's motion.  The
court explained its ruling as follows:  "Such advisement does not negate or nullify the
jury instructions, that the jury is not [to] consider the subject of penalty or punishment
in any way in rendering any verdict.  [¶]  The court advises the jury of that because
sometimes jurors do not like to serve on a death penalty case, they'd rather serve on
another type of case where the punishment isn't, you know, death.  [¶]  I understand
your argument that, in so many words, and putting it simply, it would make it easier for
a juror to render a verdict if they knew it wasn't a death penalty case, and I don't see
that as being the case.  It's just the court advises them so they can determine whether or
not they want to serve on this type of case."

Immediately after the first jury panel was brought into the courtroom, the court
stated, "I'll tell you right off the bat, this is not a death penalty case."  After explaining
the charges to the panel, the court again advised that this case did not involve the death
penalty:  "So, as I told you, this is not a death case; because some people don't like to

---

**24**    Diaz raised the issue in his opening brief.  Moore and Onley joined in Diaz's
argument through their supplemental briefs.

sit on death cases, they would rather sit on something else." The court gave a similar advisement to the second jury panel called into the courtroom.

During trial, but before the jury entered deliberations, the court instructed the jury pursuant to CALJIC 8.83.2: "In your deliberations, the subject of penalty or punishment is not to be discussed or considered by you. That is a matter which must not in any way affect your verdict or affect your finding as to the special circumstances alleged in this case."

### 2. Analysis

In *People v. Hyde* (1985) 166 Cal.App.3d 463 (*Hyde*), the Fourth District rejected a similar challenge to the trial court's advisement that the defendant's case did not involve the death penalty. There, the defendant argued that the trial court's statement to prospective jurors that the defendant's case did not involve the death penalty " 'tend[ed] to diminish the jury's sense of responsibility for its action.' [Citation.]" (*Id*. at p. 479.) The Fourth District disagreed and concluded that the trial court's statements were "proper and prudent." (*Ibid*.) The court explained its reasoning as follows: "The public commonly understands that in contrast to other criminal cases, the jury in a death penalty murder case must determine penalty as well as guilt. The moral and ethical questions surrounding the use of the death penalty have generated considerable social debate. It is reasonable to anticipate that a significant number of prospective jurors might question their ability to sit on a jury which potentially would have to consider imposition of a sentence of death. Not only did the trial judge's decision raise and dispose of the issue at the outset save time and unnecessary strain on potential jurors' psyches, but it also avoided any possibility that a prospective juror's concern about serving on a death penalty case might skew his answers to voir dire questioning." (*Ibid*.)

The court in *Hyde* also rejected the contention that advising the jury that the defendant's case did not involve the death penalty would encourage the jury to convict the defendant under a lessened standard of proof. (*Hyde*, *supra*, 166 Cal.App.3d at pp. 479-480.) The court stated, "we think it impossible to contend that a jury charged

58

with trying a murder defendant in a noncapital case is more likely to unfairly convict because of a diminished 'sense of responsibility.' " (*Id*. at p. 479.)

We agree with the analysis in *Hyde*. A case involving the death penalty raises unique and sensitive questions about punishment. Not only are jurors in a death penalty case asked to determine the defendant's sentence, a task they do not perform in non-capital cases, but they also are asked to determine whether the defendant should be put to death. It is not surprising, then, that some prospective jurors in a murder trial may be reluctant to serve on the case if they believe they will be asked to determine whether the death penalty should be imposed. Such reluctance may influence some prospective jurors to shade the truth of their responses to questions asked during voir dire, which could unnecessarily diminish the prospective jury pool when the case does not involve the death penalty. We also reject the contention that the trial court's advisement encouraged the jury to neglect its duty to carefully weigh the evidence and apply the appropriate standard of proof in determining the issue of guilt. The court properly instructed the jury on reasonable doubt and its duty not to consider the issue of punishment in determining guilt. We presume jurors understand and follow the court's instructions. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) In sum, the court did not err in advising the jury the case did not involve the death penalty.

## XII.   The Trial Court Properly Inquired into Juror Misconduct[25]

Defendants next contend the court failed to conduct an adequate inquiry into potential juror misconduct after one of the jurors sent a note to the court expressing concern that another juror was refusing to follow the reasonable doubt standard and properly weigh the evidence.

### 1.   Relevant proceedings

Two days into the jury's second round of deliberations, Juror Number 6 submitted a note expressing concern about Juror Number 3's conduct during

---

[25]   Onley raised the issue in his opening brief. Moore joined in Onley's argument through his supplemental brief, and Diaz joined in Onley's argument through his opening brief.

59

deliberations.[26]  The note read:  "Juror #3 is not following the law.  He is holding the prosecution to an unreasonable standard of 'beyond all reasonable doubt.'  He is also engaging in speculation and conjecture and is considering scenarios for which there is no evidence."

After consulting with counsel, the court called the jury into the courtroom and, in response to the foreperson's note, addressed the jury as follows:  "Well, ladies and gentlemen, the burden of proof is beyond a reasonable doubt or beyond all reasonable doubt.  It is not beyond all doubt.  It has to be a reasonable doubt.  It is not beyond a shadow of a doubt.  So understand that.  [¶]  And reasonable doubt, I'll read it to you again. . . .  [¶]  Reasonable doubt is defined as follows:  It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt.  Because anything is possible. . . .  [¶]  It is that state of the case which, after the entire comparison and consideration of the evidence, leaves the minds of the jurors in that condition that they cannot say that they feel an abiding conviction of the truth of the charge.  [¶]  It is important and imperative that you follow 2.90, the standard defined in this instruction.  [¶]  Also, you cannot engage in speculation and/or conjecture and/or imaginary doubt.  You cannot consider scenarios for which there is no evidence.  Remember that.  You can only consider what actual evidence was presented during the trial.  If there is no evidence about something, you can't consider that.  You're limited to what has been presented in terms of the evidence.  [¶]  Now, if you need further instruction on anything, the court would be more than happy to entertain any question that you may propound."

---

[26]  At the time the court received the note from Juror Number 6, the jury was in its second round of deliberations.  The jury had already deliberated for six days before the court excused Juror Number 4 for personal reasons.  The court replaced her with an alternate juror and instructed the jury to start the deliberation process anew.  The court received the note from Juror Number 6 about two days into the second round of deliberations.

After the court addressed the jury, Juror Number 3 spoke up, starting the following exchange between the court, Juror Number 3, Juror Number 6, and Juror Number 12:

Juror No. 3:    So I was not consulted on the language of that.  I'm Juror Number 3.  I'm the one that they're having the problem with.  And I disagree that I am holding the evidence or the prosecutor to a higher standard.

The Court:    Okay.

Juror No. 3:    I believe that I have deliberated in good faith and that—that—well, there's more to say, but I don't think it's necessary to go into a lengthy discussion.

The Court:    All right.  But you can represent to this court that you'll be able to follow the definition of reasonable doubt, all of you?

Juror No. 3:    [No audible response]

Juror No. 12:  I'm sorry.  First of all, it was read to him, so he did have an opportunity to hear the question before we sent it out.  It probably should have read "he's holding the prosecution to a standard of beyond all possible doubt."

The Court:    No, that is --

Juror No. 12:  And it's an unattainable standard.

Juror No. 3:    I specifically disagree with that.  [¶]  And I actually would request that the jury be directed to deliberate rather than just to come to a conclusion and then refuse to discuss in detail the evidence or the jury instructions.

The Court:    Well, what I'm going to do is send you all back there, because it sounds like you're still deliberating.  [¶]  But understand I've already stated, and I'll reiterate again, you're to follow the definition as defined in this instruction and nothing more.  Understand that.  [¶]  All right.  It sounds like you guys are deliberating.  [¶]  We have another hand, Juror Number 6.

Juror No. 6:    Yes.  My concern is that we're not deliberating.  When we try and pin our peer down on a particular topic and try and get the question that

61

he has out of him, then he shifts to another topic. [¶] I've been wanting to--he has the entire set of jury instructions, with a post-it attached to each one. He has a question about each page of the jury instructions, but he won't tell us what it is.

Moore's counsel then requested to approach the bench. The court denied the request, stating: "We're not going to engage in a colloquy, at this point, because that is really getting into the purview of what your functions are. [¶] I'm going to ask you to return back to the jury room and continue deliberating. [¶] If you have another note to propound to the court, send it out; if you need further instruction, let me know if that will be of assistance; if you need further readback, let me know if that will be of assistance. [¶] Now that you have the definition, I'm going to send you back."

The jury was then sent back to the jury room to continue deliberating. About four hours later, the jury returned its verdicts.

### 2. Legal principles

Section 1089 permits the trial court to discharge a juror at any time, including during deliberations, based upon a showing of good cause that the juror is unable to perform his or her duty. (See *People v. Wilson* (2008) 43 Cal.4th 1, 25.) A juror's refusal to deliberate, or his or her proclivity to reach a verdict without regard to the law or the evidence, demonstrates an inability to perform his or her duty and constitutes good cause for dismissal. (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 (*Cleveland*); *People v. Williams* (2001) 25 Cal.4th 441, 463.) "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) However, the fact that a juror does not deliberate well, relies on faulty logic, disagrees with the majority of jurors as to what the evidence shows, or disagrees with the majority of jurors about how the law should be applied to the facts

62

does not constitute a refusal to deliberate. (*Ibid*.) Further, a juror's disagreement about how deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. (*Ibid*.) "A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*Ibid*.)

A trial court possesses substantial discretion in managing the jury's deliberations and ensuring the jury reaches a fair and impartial verdict. While the court is obligated to make a reasonable inquiry once it is alerted to the possibility of juror misconduct (*People v. Barber* (2002) 102 Cal.App.4th 145, 150), "the decision whether (and how) to investigate rests within the sound discretion of the court." (*People v. Engleman* (2002) 28 Cal.4th 436, 442.)

"[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) "[T]he inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*Ibid*.) The court's inquiry " 'must be conducted with care so as to minimize pressure on legitimate minority jurors.' " (*People v. Haskett* (1990) 52 Cal.3d 210, 238.)

In addition, "[a] trial court may ask jurors to continue deliberating when, in the exercise of its discretion, it finds a 'reasonable probability' they will be able to reach agreement." (*People v. Howard* (2008) 42 Cal.4th 1000, 1029.) Whether a "reasonable probability" exists rests within the court's discretion, and a court is not required to accept as final any jurors' statements that the jury cannot reach a verdict. (*People v. Valdez* (2012) 55 Cal.4th 82, 159.) "If any substantial evidence exists to support the

trial court's exercise of its discretion pursuant to section 1089, the court's action will be upheld on appeal." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1351.)

### 3. Analysis

Here, the court acted well within its discretion when it ceased its inquiry and directed the jury to continue deliberating. Based on the statements from Juror Numbers 3, 6, and 12, the court reasonably could have concluded that a number of jurors simply disagreed about how deliberations should be conducted. Such a dispute does not constitute juror misconduct. (See *Cleveland*, *supra*, 25 Cal.4th at p. 485.)

Defendants contend that based on Juror Number 3's accusation that the rest of the jury was not properly deliberating, and Juror Number 6's accusation that Juror Number 3 was not properly deliberating, the court should have conducted a more thorough inquiry into potential misconduct. We disagree. The court, and not the individual jurors, is in the best position to make a legal determination of whether certain jurors are actually engaging in misconduct or simply disagree about how deliberations should be conducted. (See *People v. McDowell* (2012) 54 Cal.4th 395, 418 [if the jurors' statements are conflicting and ambiguous, we must accept the trial court's determination of the jurors' true state of mind].) No juror who addressed the court expressed an intention to refuse to deliberate, disregard the court's instructions, or engage in any other form of misconduct. Based on the results of its inquiry, the court reasonably could have concluded that the jury was still deliberating. (See *Bradford*, *supra*, 15 Cal.4th at p. 1351.) Accordingly, the court did not err by directing the jury to continue its deliberations without conducting a more thorough inquiry.

## XIII. The Trial Court Abused its Discretion When it Denied Onley's Motion for Self-Representation

Onley contends the court erred in denying as untimely his motion to represent himself at the sentencing hearing pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta* motion). Specifically, Onley argues the court abused its discretion in denying his motion as untimely because the sentencing hearing was the first opportunity he had to bring his motion after the jury reached its verdict, and he never requested the court to

continue the sentencing hearing to allow him to prepare a motion for new trial. He also argues the court failed to conduct the necessary analysis to determine whether granting the motion would unnecessarily delay the proceedings. Onley is correct.

On June 12, 2014, the jury returned its verdicts. The court then set a sentencing hearing for August 22, 2014.

At the sentencing hearing, Onley's counsel asked to be heard on an oral motion for a new trial, in which Moore's and Diaz's counsel indicated they would join. Before any arguments on the motion for a new trial were made, Onley's counsel informed the court that Onley wanted to assert his right to represent himself. The court responded, "At this point, at the time of sentencing, sir?" Onley confirmed that he wanted to represent himself. The court then stated, "At this point, the court is making a finding that it's untimely, sir."

Onley's counsel then informed the court that Onley wanted to bring his own motion for a new trial. The court responded, "You have counsel who has done that, sir. He's making a motion right now to do that." Onley replied, "For him to do it orally, I feel that he won't touch on the things that I'm asking him to touch on; therefore, I'm asking to exercise my *Faretta* rights in order to do my own retrial motion. Because for him to do it orally – he hasn't even talked to me since I left trial but one time, and that was three or four days ago." The court denied Onley's request, stating that Onley's counsel was prepared to present the motion and that the court would allow him to do so. Onley's counsel then argued the motion, which the court denied.

Under the Sixth and Fourteenth Amendments, a defendant has the right to represent himself if he is competent to do so and invokes that right voluntarily, knowingly, and intelligently. (*People v. Doolin* (2009) 45 Cal.4th 390, 453.) His request must be timely and unequivocal. (*Ibid*.) A timely request is one that is made within a reasonable time before trial, or, if a verdict has already been rendered, a reasonable time before sentencing. (*People v. Windham* (1977) 19 Cal.3d 121, 127-128 (*Windham*); *People v. Miller* (2007) 153 Cal.App.4th 1015, 1024.) The court

65

must grant a motion for self-representation that is timely, unequivocal, voluntary, knowing, and intelligent. (*Lynch*, *supra*, 50 Cal.4th at p. 721.)

If the court determines the defendant's motion for self-representation is untimely, it must look to the totality of the circumstances to determine whether granting the motion would delay the proceedings unjustifiably or obstruct the orderly administration of justice. (*Lynch*, *supra*, 50 Cal.4th at pp. 722, 724.) In doing so, the court is required to consider several factors, including: "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham*, *supra*, 19 Cal.3d at p. 128.) Although it is preferred that the court make a record of its consideration of these factors (see *ibid.*), we will affirm the court's exercise of its discretion to deny the motion if the record establishes that the court explicitly or implicitly weighed them. (See *People v. Marshall* (1996) 13 Cal.4th 799, 828 [affirming the court's order denying the defendant's motion for self-representation because "the record reflects [the court's] explicit or implicit consideration of each of the other *Windham* factors"].)

Here, the court abused its discretion in denying Onley's *Faretta* motion because there is nothing in the record that indicates the court explicitly or implicitly considered the *Windham* factors. The court did not make a record of its analysis of those factors, aside from stating that the motion was made on the date of the sentencing hearing. In addition, there is no evidence concerning the length of the delay that would occur if the court granted Onley's request. In fact, the court did not inquire into whether Onley desired a continuance if he were to represent himself on a motion for a new trial, and Onley did not indicate that he would need a continuance to prepare the motion. Accordingly, we reverse the court's order denying Onley's *Faretta* motion.

**XIV.  The Trial Court Erred in Ordering Defendants To Pay a Parole Revocation Restitution Fine**

At the sentencing hearing, the trial court ordered each defendant to pay a $300 parole revocation restitution fine under section 1202.45.  As to each defendant, the court stayed its order until defendant's parole is revoked.  Defendants contend, and the People agree, that the court erred in ordering defendants to pay a parole revocation fine because defendants were sentenced to life imprisonment without the possibility of parole.

Section 1202.45, subdivision (a) requires the court to assess a parole revocation restitution fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole . . . . "  Because each defendant was sentenced to a term of imprisonment that does not include a period of parole, the court should not have ordered each defendant to pay a parole revocation restitution fine.  (See *People v. Battle* (2011) 198 Cal.App.4th 50, 63.)  Accordingly, we direct the court to correct the sentencing minute orders and abstracts of judgment by striking the orders imposing parole revocation restitution fines.

## DISPOSITION

As to Diaz and Moore, the court is directed to modify their sentencing minute orders and abstracts of judgment by striking the parole revocation restitution fines. As modified, their judgments are affirmed.

As to Onley, his judgment is reversed for the limited purpose of providing him a new hearing on his *Faretta* motion. If the court grants Onley's *Faretta* motion but denies his motion for new trial, the court should conduct a new sentencing hearing and allow Onley to represent himself, if he wishes, at that hearing. If the court denies Onley's *Faretta* motion, Onley's original sentence and judgment should be reinstated. Regardless of the outcome of Onley's *Faretta* motion, his sentencing minute order and abstract of judgment should be modified by striking the parole revocation restitution fine.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

LAVIN, J.

WE CONCUR:

EDMON, P. J.

ALDRICH, J.

68